**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CLEARLINE CAPITAL PARTNERS LP and
CLEARLINE CAPITAL PARTNERS
MASTER FUND, LP,

                Plaintiffs,

     v.

AMERICAN REALTY CAPITAL
PROPERTIES, INC. (n/k/a VEREIT, INC.);
ARC PROPERTIES OPERATING
PARTNERSHIP L.P. (n/k/a VEREIT
OPERATING PARTNERSHIP, L.P.);
AR CAPITAL LLC; RCS CAPITAL, LLC
(n/k/a RCAP HOLDINGS, LLC);
NICHOLAS S. SCHORSCH; DAVID S.
KAY; BRIAN S. BLOCK; LISA P.
McALISTER; and LISA BEESON;

                Defendants.

Civil Action No. ___

**COMPLAINT**

**JURY TRIAL DEMANDED**

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ........................................................................................... 1

II.  JURISDICTION AND VENUE ..................................................................... 9

III.  PARTIES ........................................................................................................ 9

    A.  Plaintiffs ............................................................................................... 9

    B.  Defendants ........................................................................................... 10

IV.  SUMMARY OF THE CASE ........................................................................ 14

    A.  Defendant Schorsch's REIT Empire ................................................... 14

    B.  The Significance And Importance Of "Adjusted Funds From
       Operations" ........................................................................................... 17

    C.  American Realty's Campaign To Rapidly Grow Through Mergers
       And Acquisitions .................................................................................. 21

    D.  American Realty's Acquisition Binge Was Highly Profitable For
       Defendant Schorsch's Empire And American Realty's Executives .... 25

    E.  American Realty Rebukes Doubters And Assures Investors That
       The Company's Internal Controls Are Effective And Functioning
       Properly ................................................................................................ 27

    F.  Unknown To Investors At The Time, American Realty
       Intentionally Misstates The Company's AFFO .................................... 29

    G.  American Realty's Audit Committee Discloses That Its Top
       Officers Intentionally Misrepresented The Company's AFFO ............ 31

    H.  Defendants Schorsch, Kay And Beeson Unexpectedly "Resign" ........ 35

    I.  American Realty Confirms That It Falsified Four Years Of
       Financials And Suffered Material Weaknesses Over Internal
       Controls ................................................................................................ 36

V.  ADDITIONAL ALLEGATIONS OF SCIENTER .......................................... 40

VI.  MATERIALLY FALSE AND MISLEADING STATEMENTS ..................... 48

    A.  False And Misleading Statements Before Plaintiffs' Purchases In
       The Relevant Period ............................................................................. 50

    B.  False And Misleading Statements During The Relevant Period .......... 54

        1.  Second Quarter 2013 Financial Results ................................... 54

2.      Cole Merger Announcement And Press Release ..................................... 58

3.      Third Quarter 2013 Financial Results ...................................... 63

4.      Cole Merger Presentation ..................................................... 66

5.      ARCT IV Merger Proxy Materials ........................................ 66

6.      December 2013 Debt Offerings ............................................. 69

7.      Cole Merger Proxy Materials .............................................. 70

8.      ARCT IV Merger Closing ................................................... 73

9.      Cole Merger Closing ........................................................ 74

10.     Fourth Quarter And Year-End 2013 Financial Results........................... 78

11.     2013 Audit Opinion ......................................................... 86

12.     First Quarter 2014 Financial Results ....................................... 89

13.     May 21, 2014 Secondary Stock Offering ................................. 95

14.     REITWeek Investor Forum.................................................... 98

15.     June 20, 2014 Stockholder Memorandum .................................. 99

16.     Second Quarter 2014 Financial Results.................................... 99

VII.    AMERICAN REALTY VIOLATED GAAP AND SEC RULES................................ 107

VIII.   INAPPLICABILITY OF STATUTORY SAFE HARBOR ........................................ 108

IX.     PLAINTIFFS' RELIANCE ....................................................... 108

X.      LOSS CAUSATION................................................................ 114

XI.     CLAIMS FOR RELIEF .......................................................... 116

XII.    PRAYER FOR RELIEF .......................................................... 120

XIII.   JURY TRIAL DEMAND ......................................................... 121

This action is brought by Clearline Capital Partners LP and Clearline Capital Partners Master Fund, LP (together, "Plaintiffs") under the Securities Exchange Act of 1934 ("Exchange Act") and New York law to recover damages for losses Plaintiffs suffered in connection with their purchases and acquisitions of security-based swap agreements ("American Realty Swaps" or "Swaps") representing shares of American Realty Capital Properties, Inc. ("American Realty" or the "Company") (n/k/a VEREIT, Inc.) common stock from October 7, 2013 through October 29, 2014, inclusive (the "Relevant Period"). Plaintiffs allege the following upon personal knowledge as to their own acts and upon information and belief as to all other matters. Their information and belief is based on, among other things, the investigation conducted by their counsel.

## I.    INTRODUCTION

1.    This case is about a multi-year accounting fraud orchestrated by the top corporate executives of American Realty, which is one of the largest real-estate investment trusts ("REITs") in the world. Once these executives' fraud and attempted cover-up were brought to light, the Company was forced to restate its prior financials for seven consecutive reporting periods and summarily terminate all five of its top officers and the majority of its Board of Directors. In addition, the Company's former Chief Accounting Officer ("CAO") filed a complaint that directly implicated the Company's most senior executives in fraud. The Department of Justice ("DOJ"), Federal Bureau of Investigation ("FBI"), U.S. Securities and Exchange Commission ("SEC") and state regulators initiated criminal and civil probes, and the Company's stock price plummeted by over 36%, causing Plaintiffs and other investors to lose billions of dollars.

2.    American Realty was founded by Defendant Nicholas S. Schorsch ("Schorsch") in 2010. Schorsch acted as Chief Executive Officer ("CEO") and Chairman of the Company throughout the Relevant Period. Schorsch took the Company public in September 2011, reaping hundreds of millions of dollars for himself in the process. Upon going public, American Realty –

still controlled by Schorsch – began an acquisition spree, snapping up numerous real estate companies in an effort to grow its assets, transferring hundreds of millions of dollars to entities owned or controlled by Schorsch and other senior insiders, which further lined these executives' pockets with lavish compensation.  This acquisition strategy resulted in American Realty purchasing seven major real estate companies between February 2013 and July 2014 at an average price of over $3 billion, including rival Cole Real Estate Investments, Inc. ("Cole, Inc." or "Cole") for $11.2 billion.  As a result of these acquisitions, American Realty ballooned from a moderately sized company with $132 million in assets at year-end 2011 to a real estate empire with $21.3 billion in assets by mid-2014.

3.     Throughout this growth period, American Realty assured investors that its internal controls were effective and that its financial statements were accurate and could be trusted. Analysts and investors believed these representations, devoting particular attention to the Company's reported "Adjusted Funds From Operations" ("AFFO").  AFFO is a basic financial metric commonly used by investors to evaluate the financial health of a REIT, and is often equated to "earnings per share" for non-REIT companies.  American Realty stressed the importance of its AFFO figure to investors during the Relevant Period, representing that it was pivotal to "assess the sustainability of our operating performance."

4.     Each quarter, American Realty touted its "record" AFFO, which regularly exceeded analysts' estimates and outmatched its competitors.  For example, on May 6, 2013, American Realty reported AFFO of nearly $31 million for the first quarter of 2013, a ***720% increase*** from the prior quarter.  Likewise, on November 7, 2013, American Realty reported AFFO of $47 million for the third quarter of 2013, a ***40% increase*** from the prior quarter.  On February 27, 2014, the Company again reported "record" financial results and fourth quarter AFFO of $56 million,

handily beating analysts' estimates and exceeding reported AFFO for the corresponding prior year period by over **150% greater**.  Finally, on May 8, 2014, the Company reported a record-high AFFO of $147 million for the first quarter of 2014, which was more than **330% greater** than what it reported for the same period in 2013.  Analysts and investors applauded the Company for these purportedly exceptional results, calling American Realty **"one of the most compelling investment opportunities across the REIT sector."**[1]

5.     Unknown to investors, these reported AFFO figures were materially overstated, and the Company's supposed success from its acquisition spree was largely the product of an accounting fiction.  American Realty created the illusion that its financial health was superior to what it actually was by misrepresenting its AFFO, as well as the methodology used to calculate it. The Company misrepresented AFFO by overstating the adjustments that were added back to net income.   Specifically, while the Company should have only included in its AFFO figures adjustments associated with entities it controlled, it improperly also added back adjustments associated with non-controlling interests.  This misrepresentation caused American Realty's AFFO to be materially inflated during the Relevant Period, which in turn enabled the Company to continue its acquisition spree with the support of its shareholders and easy access to additional capital.

6.     The Company's massive acquisition spree and accompanying accounting fraud also enabled Schorsch and other senior American Realty insiders to reap hundreds of millions of dollars in improper transaction fees, commissions, and compensation.  As set forth in the Company's annual reports, such payments included, for example, over $15 million for "post-transaction support services," "public relations support," and "services relating to office supplies"; over $17

---

[1] Throughout, all emphasis is added unless otherwise noted.

million for "financing coordination fees"; over $20 million for the purported sale to the Company of "furniture, fixtures, and equipment" (for which "no evidence" was found substantiating at least a third of such property); over $60 million for "strategic advisory services"; over $175 million for "subordinated distribution fees"; and over $300 million for unspecified "commissions and fees." Further, as the Company later admitted, the accounting scheme also improperly increased these executives' bonus pool by nearly $100 million beyond authorized amounts.  All told, American Realty executives ensured that more than $900 million was paid directly or indirectly to American Realty insiders and its affiliates in connection with the Company's "growth-by-acquisition" strategy.

7.    The Company's former CAO, Lisa P. McAlister ("McAlister"), filed a complaint in New York state court detailing the Company's accounting fraud.  Defendant McAlister, who purportedly resigned from the Company as a result of her role in the scheme, sued the Company, Schorsch, and American Realty's former President, Defendant David S. Kay ("Kay"), claiming that she had been defamed and terminated for reporting accounting malfeasance at the Company. McAlister's complaint confirmed that the fraud was deliberately orchestrated from the very top of the Company.  In particular, McAlister explained that the improper and undisclosed change to the Company's method for calculating AFFO – from "net" to "gross" basis – was made "***suddenly and without any apparent justification or basis***."  The purpose of the change, McAlister admitted, was simple: "***to avoid public disclosure of [American Realty's] faltering financial performance***." This change was not the decision of a rogue low-level employee, but rather was "***ordered***" by Defendants Schorsch, Kay and American Realty's former Chief Financial Officer ("CFO"), Defendant Brian S. Block ("Block").  As McAlister explained, Schorsch instructed Defendant Block "***to take steps that would cover up the improper change in accounting***," including by

4

altering American Realty's financial statements in ways that would make it "***more difficult for stockholders to see the fraudulent***" accounting.  When Defendant McAlister expressed her concerns to Defendants Schorsch and Kay about these fraudulent practices, she was "***berated***" and "***retaliat[ed]***" against for "***blowing the whistle***."

8.    American Realty's accounting fraud was kept hidden from investors until October 29, 2014.  On that date, the Company stunned the market by issuing a press release that disclosed the preliminary results of an internal investigation conducted by its Audit Committee. With the assistance of independent counsel and a forensic accountant, the Audit Committee determined that the Company had "***intentionally***" misreported its AFFO figures in various financials issued during the Relevant Period, which had been "***identified***" by the Company's senior management, but "***intentionally not corrected***."  The Audit Committee further found that the Company's prior financials needed to be restated and "***should no longer be relied upon***."  Finally, the Audit Committee revealed that the Company's internal controls over financial reporting were defective and that its CFO, Defendant Block, and its CAO, Defendant McAlister, had been terminated.

9.    The Company's October 29, 2014 revelations decimated the Company's stock price, causing it to plunge by ***19%*** from the prior day's close, and wiping out over ***$2.2 billion*** in shareholder market capitalization overnight.   Within hours of the Audit Committee's announcement, numerous securities analysts slashed its ratings and cut its price targets for the Company, expressing outrage that American Realty and its executives would engage in such "highly disappointing" misconduct.

10.    Over the next three days, the Company's stock price continued to fall as a result of its admitted accounting fraud.  On October 29, 2014, *The Wall Street Journal* reported that the SEC

had initiated a civil investigation into the Company's accounting improprieties.  Shortly thereafter, *Reuters* reported that the FBI and federal prosecutors opened their own probes, which "raise[d] the stakes for the company" by exposing it to potential criminal liability.  On November 3, 2014, RCS Capital Corporation – which had previously agreed to purchase an American Realty subsidiary at a steep premium – cancelled the parties' contract due to the October 29 disclosures.

11.     During the three trading days immediately following American Realty's October 29 revelations, the Company's stock lost over ***36%*** of its value and the Company's shareholders lost over ***$4 billion*** in market capitalization – based on the approximately ***925 million*** shares outstanding at such time – as reflected in the below chart:



12.     On March 2, 2015, the Company announced the final results of its investigation.  The Company admitted that it had falsified its reported operating performance for ***each and every reporting period since it went public in 2011***, and officially restated ***nearly three years*** of its prior financial statements (the "Restatement").  The breadth of the Restatement was extraordinary.  The Company disclosed that it committed a host of accounting errors and financial statement

misrepresentations, including serious and serial misapplication of U.S. Generally Accepted Accounting Principles ("GAAP").

13.     Additionally, as the Company's Audit Committee and outside auditor, Grant Thornton LLP, confirmed, the nature of the wrongdoing at American Realty ran far deeper than initially disclosed on October 29, 2014, and encompassed dozens of accounting tricks intended to inflate AFFO, line executives' pockets, or both.  These artifices included the repeated (i) improper accounting for non-controlling interests; (ii) misclassification of recurring general and administrative expenses as non-recurring merger and other non-routine transaction-related expenses; (iii) delay of expense recognition based on when expenses would have the least detrimental impact on reported AFFO; (iv) improper use of so-called goodwill from acquisitions as a slush fund to absorb losses from the subsequent sale of individual properties; (v) wholesale exclusion of selected expenses; and (vi) employment of improper and arbitrary metrics for determining executive compensation to increase the executive bonus pool.  Highlights from the disclosures include:

- AFFO was materially overstated for 2011 (by 7.2%), 2012 (by 2.7%), 2013 (by 23%), first quarter 2014 (by 35%) and second quarter 2014 (by 10.4%);[2]

- The Company admitted that its internal controls over financial reporting and its disclosure controls **were not effective** as of December 31, 2013, March 31, 2014, June 30, 2014 and September 30, 2014;

- Prior to the first quarter of 2014, members of senior management "**were aware of [the accounting] errors but allowed [the 1Q 2014] report to be filed without completing an analysis of the errors**";

- The Company admitted that it made compensation awards to Schorsch and Block that "**were more favorable to them than the [Compensation Committee] had authorized**"; and

---

[2] Amounts are based on the Company's financial statements as filed and do not take into account the effects of the ARCT III and ARCT IV mergers, which would result in an even greater overstatement for certain reporting periods.

- The Company admitted it made $8.5 million in "*inappropriate*" payments to ARC Properties Advisors, a management company that was controlled and owned by Schorsch.

14.    As a result of the Audit Committee's investigation, American Realty restated its financial results for 2012, 2013, and the first two quarters of 2014 – *i.e.*, ten fiscal quarters and seven consecutive reporting periods.

15.    Within six weeks of the Restatement, *every senior executive employed by the Company during the Relevant Period* – its CEO, CFO, CAO and Chief Operating Officer ("COO") – had been asked to leave the Company or been terminated.  As detailed above, the former CAO even *sued the Company* claiming that she had been defamed and terminated for reporting the accounting fraud.

16.    The fraudulent accounting and the complete lack of effective internal controls at American Realty stood in stark contrast to Defendants' public representations and assurances to Plaintiffs and other investors during the Relevant Period.  Defendants' repeated misstatements and material omissions provided a false portrayal of the Company's financial health and the effectiveness of its internal controls, and caused American Realty stock – and, in turn, American Realty Swaps – to trade at artificially inflated prices throughout the Relevant Period.  But for these repeated material misrepresentations, Plaintiffs would not have purchased their American Realty Swaps, or would not have paid the prices they paid.  When the truth about American Realty's financial performance, internal control deficiencies, and pervasive accounting fraud was revealed to the market, the artificial inflation in American Realty common stock was removed, causing Plaintiffs to suffer substantial losses on their investments in the Company.

17.    Through this action, Plaintiffs assert claims under the Exchange Act and New York law to recover their losses incurred in connection with their investments in American Realty Swaps.

## II.    JURISDICTION AND VENUE

18.    This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

19.    This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

20.    Venue is properly laid in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391.    The acts and conduct described in this Complaint, including the dissemination of false and misleading statements and information, occurred in substantial part in this District.

21.    In connection with these acts, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the United States mails, interstate telephone communications and the facilities of a national securities exchange, namely, the NASDAQ stock market ("NASDAQ").

## III.    PARTIES

### A.    Plaintiffs

22.    Clearline Capital LP ("Clearline Capital") is a Delaware limited partnership with its principal address at 950 Third Avenue, 23rd Floor New York, New York 10022.    Clearline Capital is a registered investment advisor.    The following investment funds that are advised by Clearline Capital are plaintiffs in this action:  Clearline Capital Partners LP, a Delaware limited partnership located in New York, New York; and Clearline Capital Partners Master Fund, LP, an exempted limited partnership located in Grand Cayman, Cayman Islands.

23.    During the Relevant Period, Plaintiffs purchased security-based swap agreements representing millions of shares of American Realty common stock.  Plaintiffs' American Realty Swaps were economically equivalent to the purchase of shares of American Realty common stock.

The Swaps economically replicated physical trading and ownership of the Company's common stock, and the prices of American Realty Swaps were pegged to the market prices of the referenced American Realty shares. During the Relevant Period, Plaintiffs relied on the misstatements alleged below and suffered damages as a result of the violations pled herein. Plaintiffs bring the instant claims for and on behalf of themselves and for and on behalf of their managed funds and accounts which purchased or acquired Swaps during the Relevant Period and were damaged thereby.

### B.    **Defendants**

#### 1.    **Corporate Defendants**

24.    Defendant American Realty is a Maryland corporation headquartered at 405 Park Avenue, 15th Floor, New York, New York 10022. American Realty owns and acquires freestanding commercial real estate leased on a medium-term basis pursuant to triple net leases. American Realty is a subsidiary of AR Capital LLC, which is a subsidiary of RCS Capital, LLC, the parent company of the Schorsch real estate investment group. Substantially all of American Realty's business is conducted through its operating partnership, ARC Properties (defined immediately below), of which American Realty is the sole general partner. During the Relevant Period, the Company's common stock traded on the NASDAQ. On July 28, 2015, American Realty issued a press release announcing that it was changing its name to "VEREIT, Inc." in an effort to "focus on the future." In addition, the Company adopted a new logo, re-designed its website, unveiled new "brand messaging," and re-listed its securities on the New York Stock Exchange.

25.    Defendant ARC Properties Operating Partnership L.P. (n/k/a VEREIT Operating Partnership, L.P.) ("ARC Properties" or "Operating Partnership") is a subsidiary, and the operating partnership, of American Realty. American Realty is ARC Properties' sole general partner. As of June 30, 2014, American Realty owned 97.3% of the common equity interests in ARC Properties.

ARC Properties is a Delaware limited partnership located at 405 Park Avenue, 15th Floor, New York, New York 10022.

26. Defendant AR Capital, LLC ("AR Capital") is a limited-liability company that purported to provide management and advisory services to American Realty and its affiliates. AR Capital is a subsidiary of RCS Capital. AR Capital is directly or indirectly owned and controlled by Defendants Schorsch and Block, and other various former officers and directors of American Realty, including (i) Edward M. Weil ("Weil"), who served as ARCP's President, Treasurer and Secretary from its formation until January 2014, and was member of American Realty's Board of Directors from March 2012 through June 2014; (ii) Peter M. Budko ("Budko"), who was American Realty's Executive Vice President and Chief Investment Officer from December 2010 until January 8, 2014; and (iii) William M. Kahane ("Mr. Kahane"), who was a member of American Realty's Board of Directors from February 2013 until June 24, 2014. During the Relevant Period, Schorsch, Weil, and Budko held executive officer positions at AR Capital.

27. Defendant RCS Capital, LLC ("RCS Capital") (n/k/a RCAP Holdings, LLC) is an investment and financial services firm. Through its subsidiaries, RCS Capital offers real estate investment trust management, securities brokerage, investment banking, transaction management, program management, risk analysis and portfolio management. RCS Capital's subsidiaries include AR Capital and RCS Capital Corporation ("RCAP"). RCS Capital was the ultimate parent entity in the Schorsch empire. During the Relevant Period, RCS Capital was owned and/or controlled by Schorsch, who served as its Chairman, and Mr. Kahane.

**2. Executive Defendants**

28. Defendant Nicholas S. Schorsch founded American Realty in 2010 and was its CEO and Chairman during the Relevant Period. Schorsch "resigned" as CEO on October 1, 2014, but remained Chairman until December 15, 2014, when he "stepped down" from the Company's Board

of Directors following American Realty's October 29, 2014 disclosures. During the Relevant Period, Defendant Schorsch also was an officer and director at numerous entities related to American Realty.[3] During the Relevant Period, Defendant Schorsch reviewed, approved, and signed American Realty's false and misleading SEC filings, including the Second Quarter 2012 Form 10-Q, Third Quarter 2012 Form 10-Q, 2012 Form 10-K, First Quarter 2013 Form 10-Q, Second Quarter 2013 Form 10-Q, Third Quarter 2013 Form 10-Q, 2013 Form 10-K, First Quarter 2014 Form 10-Q, and Second Quarter 2014 Form 10-Q, and signed certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 therein ("SOX Certifications"). Defendant Schorsch also reviewed, approved and signed the Form S-3ASR filed by American Realty on March 14, 2013 (the "2013 Shelf Registration Statement") and the American Realty Capital Trust, IV, Inc. registration statement/proxy (the "ARCT IV Registration Statement/Proxy"). Defendant Schorsch also reviewed and approved false and misleading press releases and signed all of American Realty's Forms 8-K issued during the Relevant Period. Defendant Schorsch also participated in conference calls with securities analysts during which American Realty's false and

[3] These include RCS Capital Management, LLC (CEO); RCAP Holdings LLC (Chairman and CEO); American Realty Capital Global Trust, Inc. (Chairman and CEO); American Realty Capital Global Trust II, Inc. (Chairman); AR Capital Acquisition Corp. (Chairman); ARC Properties Advisors, LLC (CEO); American Realty Capital Trust V, Inc. (Chairman and CEO); Corporate Income Properties – ARC, Inc. (President and Director); American Realty Capital Daily Net Asset Value Trust, Inc. (Chairman and CEO); American Realty Capital Healthcare Trust, Inc. (Chairman and CEO); American Realty Capital Healthcare Trust II, Inc. (Chairman); American Realty Capital Healthcare Trust III (Chairman); American Realty Capital Hospitality Trust, Inc. (Chairman); American Realty Capital New York City REIT, Inc. (Chairman and CEO); New York REIT (Chairman and CEO); American Realty Capital – Retail Centers of America II, Inc. (Chairman and CEO); ARC Realty Finance Trust ( Chairman and CEO); American Realty Capital – Retail Centers of America, Inc. (Chairman and CEO); American Realty Capital Trust Advisors, Inc. (Chairman and CEO); AR Capital Acquisition Corp. (Chairman); American Realty Capital Trust IV, Inc. (Chairman and CEO); Cole Corporate Income Trust, Inc. (Chairman, President and CEO); Cole Credit Property Trust, Inc. (Chairman and CEO); Cole Credit Property Trust IV, Inc. (Chairman, President and CEO); Cole Credit Property Trust V, Inc. (Chairman); Cole Office & Industrial REIT, Inc. (Chairman, President and CEO); Cole Real Estate Income Strategy, Inc. (Chairman, President and CEO); Phillips Edison – ARC Grocery Center REIT II (CEO); and Business Development Corporation of America (Chairman and CEO).

misleading filings with the SEC and its press releases were presented and discussed, including on August 1, 2012, May 6, 2013, May 28, 2013, July 2, 2013, August 6, 2013, October 23, 2013, November 7, 2013, February 27, 2014 and May 8, 2014.

29.    Defendant Brian S. Block ("Block") was American Realty's CFO and Executive Vice President beginning in December 2010, as well as its Treasurer and Secretary beginning in January 2014.  On October 28, 2014, Defendant Block "resigned" from the Company.  During the Relevant Period, Defendant Block reviewed, approved, and signed American Realty's false and misleading SEC filings, including the Second Quarter 2012 Form 10-Q, Third Quarter 2012 Form 10-Q, 2012 Form 10-K, First Quarter 2013 Form 10-Q, Second Quarter 2013 Form 10-Q, Third Quarter 2013 Form 10-Q, 2013 Form 10-K, First Quarter 2014 Form 10-Q, and Second Quarter 2014 Form 10-Q, and signed SOX Certifications.  Defendant Block reviewed, approved and signed the 2013 Shelf Registration Statement and ARCT IV Registration Statement/Proxy.  Defendant Block also participated in conference calls with securities analysts, during which American Realty's false and misleading filings with the SEC and its press releases were presented and discussed, including on August 1, 2012, October 30, 2012, February 28, 2013, May 6, 2013, May 28, 2013, July 2, 2013, August 6, 2013, October 23, 2013, November 7, 2013, February 27, 2014, May 8, 2014 and July 29, 2014.

30.    Defendant David S. Kay was American Realty's President from December 2013 until October 1, 2014, after which he replaced Defendant Schorsch as the Company's CEO and joined the Company's Board of Directors.  On December 15, 2014, American Realty announced that Defendant Kay had "stepped down" as the Company's CEO and as a member of its Board of Directors.  During the Relevant Period, Defendant Kay reviewed, approved, and signed American Realty's false and misleading SEC filings, including the 2013 Form 10-K.  Defendant Kay also

participated in conference calls with securities analysts, during which American Realty's false and misleading filings with the SEC and its press releases were presented and discussed, including on February 27, 2014, May 8, 2014 and July 29, 2014.

31.     Defendant Lisa McAlister was American Realty's Senior Vice President and CAO from November 4, 2013 through October 28, 2014, when she was terminated.  As set forth in an American Realty press release, McAlister was appointed to the position of CAO "to manage the accounting and financial functions of the company and aid in the integration of American Realty's recently closed and pending transactions, including working closely with the financial and senior management teams at Cole, Inc. (NYSE: COLE) to manage the financial integration of the companies." During the Relevant Period, Defendant McAlister reviewed, approved, and signed American Realty's false and misleading SEC filings, including the 2013 Form 10-K and the Second Quarter 2014 Form 10-Q.

32.     Defendant Lisa Beeson ("Beeson") was American Realty's COO beginning on November 4, 2013, as well as its President beginning October 1, 2014.  On December 15, 2014, American Realty announced that she had "stepped down" from both positions.  During the Relevant Period, Beeson, in her capacity as an officer of the Company, made the statements and took the actions detailed herein, including participation in conference calls with securities analysts and solicitation of merger proxies.

33.     Defendants Schorsch, Block, Kay, McAlister and Beeson are collectively referred to herein as the "Executive Defendants."

## IV.     SUMMARY OF THE CASE

### A.     Defendant Schorsch's REIT Empire

34.     American Realty's founder, Defendant Schorsch, entered the commercial real estate business in 1998.  In 2006, Defendant Schorsch – who has been characterized by *Forbes* as a

"hard-charging, fast-talking real estate chief" – devised a way to accumulate substantial personal wealth.  His strategy consisted of obtaining funds from investors to finance a complex web of interrelated companies, including non-traded REITs, public REITs, research and advisory firms and management companies.  He raised money for his non-traded REITs, took them public, and then used those vehicles to buy out other non-traded REITs.  Through his vertically integrated real estate empire, Schorsch collected hundreds of millions of dollars by means of profit-sharing arrangements, director fees, and compensation for "research and advisory services" that he provided to his related entities.

35.    In 2010, Defendant Schorsch founded American Realty, one of his many related entities, and appointed himself Chairman and CEO.  Schorsch took American Realty public in September 2011 and listed the Company on the NASDAQ exchange.  American Realty owned and acquired single-tenant, freestanding commercial real-estate properties subject to "net leases."  In a net lease, the tenant pays the expenses that are traditionally borne by the landlord, such as building maintenance expenses, property taxes, and insurance.  These lease arrangements allowed American Realty to distribute the rent received from its properties, less certain fees, to its shareholders as "dividends."  American Realty's tenants included many prominent commercial lessees such as Red Lobster, Walgreens, CVS, Dollar General, FedEx, Family Dollar, GSA, Albertsons, Citizens Bank, and AT&T.

36.    After taking American Realty public, Schorsch kept the Company part of his close-knit network of real estate companies.  American Realty remained a subsidiary of AR Capital, which itself is a subsidiary of RCS Capital, the parent entity of Schorsch's real estate group.  Schorsch also ensured that he maintained complete control over American Realty's business by conducting the Company's daily operations through its operating partnership, ARC Properties.  As

15

reflected in the graphic below, these entities were part of an even more complex network of companies that Defendant Schorsch owned and controlled during the Relevant Period.



37.    Defendant Schorsch maintained control over his real estate network by occupying executive leadership positions at each one of his interrelated entities.  Until recently, Defendant Schorsch was the Chairman and, in some cases, CEO and President of all of his numerous related real estate companies, including American Realty.  These companies had overlapping boards of directors and executives, all of whom ultimately reported to Defendant Schorsch, as reflected in the below chart.



**The many roles of Nicholas Schorsch**

| Company | Position |
|---|---|
| American Realty Capital - Retail Centers of America Inc. | Chairman and CEO |
| American Realty Capital Daily Net Asset Value Trust Inc. | Chairman and CEO |
| American Realty Capital Global Trust II Inc. | Chairman and CEO |
| American Realty Capital New York City REIT Inc. | Chairman and CEO |
| ARC Realty Finance Trust Inc. | Chairman and CEO |
| American Realty Capital Trust V Inc. | Chairman and CEO |
| American Realty Capital - Retail Centers of America II Inc. | Chairman, treasurer and CEO |
| Business Development Corp. of America | Chairman and CEO |
| Business Development Corp. of America II | Chairman and CEO |
| Cole Corporate Income Trust Inc. | Chairman, president and CEO |
| Cole Credit Property Trust IV Inc. | Chairman, president and CEO |
| Cole Credit Property Trust V Inc. | Chairman, president and CEO |
| Cole Office & Industrial REIT Inc. | Chairman, president and CEO |
| Cole Real Estate Income Strategy (Daily NAV), Inc. | Chairman, president and CEO |
| New York REIT Inc. | Chairman and CEO |
| American Realty Capital Global Trust Inc. | Chairman |
| American Realty Capital Healthcare Trust II Inc. | Chairman |
| American Realty Capital Healthcare Trust III Inc. | Chairman |
| American Realty Capital Healthcare Trust, Inc. | Chairman |
| American Realty Capital Hospitality Trust, Inc. | Chairman |
| American Realty Capital Properties Inc. | Chairman |
| RCS Capital Corp. | Chairman |

38.     Through this elaborate web of corporate arrangements, Defendant Schorsch directly and indirectly controlled the accounting for each of his entities, including American Realty. He also made certain that he profited personally from their operations. Throughout the Relevant Period, Schorsch engaged in self-dealing – described to investors as "services" – through which Schorsch reaped hundreds-of-millions of dollars in the form of compensation and fees.

**B.     The Significance And Importance Of
"Adjusted Funds From Operations"**

39.     In evaluating American Realty's stock (and stock-based swap agreements), investors largely focused on the Company's AFFO, which typically provides REIT investors with an important metric by which REIT investors measure anticipated "dividend" payments. The Company stated in its financial statements filed with the SEC that it calculated AFFO by first determining its funds from operations ("FFO") and then excluding certain balance sheet line items, including acquisition-related fees and expenses, deferred financing costs, non-cash mark-to-market adjustments, and non-cash compensation.

40.     American Realty repeatedly stressed to investors the importance of its reported AFFO throughout the Relevant Period. In its SEC filings, proxy materials, press releases,

presentations, and conference calls, the Company represented that its reported AFFO allowed investors to evaluate the sustainability of American Realty's long-term operating performance and to compare American Realty's performance with other companies, many of which did not have the Company's level of merger and acquisition activity.   For example, in its 2013 Form 10-K, American Realty stated that:

> By providing AFFO, we believe we are presenting useful information that assists investors and analysts to better assess the sustainability of our ongoing operating performance without the impacts of transactions that are not related to the ongoing profitability of our portfolio of properties.   We also believe that AFFO is a recognized measure of sustainable operating performance by the REIT industry. Further, we believe AFFO is useful in comparing the sustainability of our operating performance with the sustainability of the operating performance of other real estate companies that are not as involved in activities which are excluded from our calculation.

41.    All of the Company's SEC filings during the Relevant Period reported the Company's purported AFFO, with each of them including a table that supposedly described precisely how the Company calculated its AFFO each quarter.   Importantly, American Realty represented in these filings that it calculated AFFO on a "***net basis***."   Under this method, only net income and adjustments associated with American Realty's equity interest in the Operating Partnership were supposed to be considered in calculating AFFO.   Because American Realty held 96.5% of the equity interest in the Operating Partnership during the Relevant Period, the Company was permitted to "add back" only 96.5% of costs when calculating AFFO.

42.    During and before the Relevant Period, American Realty issued press releases and financial statements that reported "record" AFFO.   Moreover, the Company's AFFO each quarter regularly beat its competitors and exceeded analysts' estimates.   For example, on May 6, 2013, American Realty reported AFFO for the first quarter of 2013 of nearly $31 million, which was 720% greater than the prior quarter.   Then, in the third quarter of 2013, American Realty reported AFFO of $47 million, which was a 40% increase from the prior quarter.   On February 27, 2014,

the Company again reported "record" financial results and fourth quarter AFFO of $56 million, which was over 150% more than the AFFO from the corresponding prior year period. Lastly, on May 8, 2014, the Company reported a record-high AFFO of $147 million for the second quarter of 2014, which was more than 330% greater than what it reported for the same period in 2013.

43.    In showcasing the Company's reported AFFO during the Relevant Period, American Realty made numerous references "highlighting" AFFO in the press releases accompanying the filing of its quarterly and annual financial results. For example, in the press releases accompanying the disclosure of American Realty's financial results for 2013, as well as the first and second quarters of 2014, the Company included as a "highlight" its "increased AFFO." When commenting on the financial results in the press releases, the Executive Defendants further touted AFFO as a cornerstone of the Company's financial performance:

- "With strong AFFO per share growth, an attractive property portfolio, strong credit tenants bounded by long-term net leases and an attractively positioned balance sheet, we believe ARCP has the catalysts to provide long-term shareholder returns." (Feb. 27, 2014 American Realty Press Release, quoting Defendant Block);

- "We had a record quarter with earnings coming exactly in line with our expectations of $0.26 AFFO per share, consistent with our previously stated guidance for the year." (May 8, 2014 American Realty Press Release, quoting Defendant Schorsch); and

- "The daily execution of these collective actions allows us to maintain our 2014 AFFO per share guidance of $1.13 - $1.19, while significantly de-levering the balance sheet and maximizing value for our stockholders." (July 29, 2014 American Realty Press Release, quoting Defendant Kay).

44.    Analysts relied heavily on the Company's reported AFFO in evaluating American Realty's financial condition and stock price. For example, Barclays Capital, the Company's financial advisor, assessed the value of American Realty by "calculat[ing] and analyz[ing] the ratio of its current stock price to its calendar year 2014 estimated AFFO based on Wall Street research consensus estimates." Research analysts at Ladenburg Thalmann, BMO Capital Markets, and JMP

Securities similarly evaluated American Realty's stock on a price-to-AFFO basis. In one analyst report, for example, JMP Securities concluded that American Realty's price-to-AFFO multiple of eleven-times AFFO – in comparison to its peer group, which had an average price-to-AFFO multiple of fifteen-times – made American Realty a "must own" stock.

45.    Unknown to investors at the time, the Company's reported AFFO was not a reliable metric to assess American Realty's true value, the sustainability of its operating performance, or its performance relative to its competitors. The Company's reported AFFO, in fact, provided an inaccurate picture of its financial condition that bore little resemblance to its true financial condition and misled investors into believing that American Realty was an attractive REIT to own.

46.    As American Realty has now admitted, the financial statements and non-GAAP financial measures it issued to investors during the Relevant Period were materially false and misleading and "should no longer be relied upon."

47.    American Realty has acknowledged that the Company's Relevant Period financial statements were replete with accounting errors and/or manipulations, resulting in overstated AFFO each and every year during the Relevant Period, with the overstatement reaching as high as 100% in certain quarters. American Realty has also admitted that it understated net losses attributable to stockholders during the Relevant Period, as much as 26% in certain quarters.

48.    As discussed herein, American Realty has restated its GAAP financial statements to correct numerous violations of GAAP and financial reporting standards, including:

    (a)    Classifying ordinary business expenses as "merger-related," which improperly inflated AFFO and gave investors the false impression that such expenses were non-recurring. As restated, the expenses were reclassified as general and administrative expenses.

    (b)    Recording expenses in the incorrect accounting period, thus delaying expense recognition and understating reported expenses.

(c)    Improperly classifying management fees to affiliates as being related to mergers or other non-routine transactions, which camouflaged related-party transactions, inflated AFFO and gave investors the false impression that such expenses were non-recurring.  As restated, the expenses were reclassified as management fees to affiliates.

(d)    Improperly recording merger and other transaction-related expenses as deferred financing costs, which should have been capitalized and amortized in the amounts of $1.0 million, $0.2 million, $5.9 million, $20.6 million, and $0.8 million of the periods of 1Q13, 3Q13, FY13, 1Q14, and 2Q14, respectively.

(e)    Recording payments to Schorsch-controlled entities as being for the acquisition of furniture, fixtures and equipment, and including those purported assets on its books, even though there was "no evidence of the receipt" to substantiate the existence of any such assets.  The Company restated the payments by writing off the amounts.

(f)    Additionally, as detailed herein, American Realty had inadequate and deficient internal controls that permitted the misstatement of its financial results and reported AFFO.  Among these deficiencies were (i) the lack of controls preventing senior management from changing American Realty's financial statements without a proper basis, review and approval; and (ii) a lack of control over the formulation of the AFFO and the evaluation of the Company's ability to meet AFFO guidance.

49.    Despite the above-identified accounting errors and the lack of key financial controls, Defendants Schorsch and Block certified to investors for each quarter that American Realty has been a public company that they had designed, reviewed, evaluated, and found American Realty's controls "effective" to prevent the very type of misstatements American Realty has now admitted occurred.

### C.    American Realty's Campaign To Rapidly Grow Through Mergers And Acquisitions

50.    By reporting favorable AFFO results, American Realty was able to secure capital infusions and garner investor support necessary to allow American Realty to go forward with its stated goal: to convert the Company into an "acquisition machine."

51.    Schorsch succeeded in his efforts.  According to *The Wall Street Journal,* between 2012 and 2013, American Realty's assets rose nearly 100-fold, from approximately $220 million to $20.5 billion.  Moreover, in just three years, American Realty grew into one of the largest REITs in the country, with over $21.3 billion in assets.  This rapid expansion was the product of an aggressive merger-and-acquisition campaign, which American Realty was only able to accomplish through the sale to investors of billions of dollars of additional equity and debt securities.  The Company's acquisitions include:

- The acquisition of American Realty Capital Trust, III, Inc. ("ARCT III") on February 28, 2013 for $2.2 billion;

- The acquisition of GE Capital Properties on June 28, 2013 for $774 million;

- The acquisition of CapLease, Inc. on November 5, 2013 for $2.2 billion;

- The acquisition of ARCT IV on January 3, 2014 for $3 billion;

- The acquisition of Fortress Group Properties on January 8, 2014 for $601 million;

- The acquisition of Cole, Inc. on February 7, 2014 for $11.2 billion; and

- The acquisition of Red Lobster properties on July 28, 2014 for $1.5 billion.

52.    Throughout American Realty's acquisition spree, Defendants represented that each transaction was favorable to shareholders, added value to the Company, and increased the Company's AFFO.  For example, in connection with the CapLease merger, Defendant Schorsch announced that "[t]he acquisition is expected to result in approximately 11% accretion to our AFFO in 2014" and that American Realty expected "to add $0.11 per share to our AFFO" as a result of the acquisition.  Similarly, in connection with the ARCT IV merger, the Company announced an increase in AFFO estimates "equivalent to approximately 31% growth over 2013[] AFFO per share."  Defendants further represented in connection with these purchases that the

Company had the internal controls necessary to properly account for its acquisition activity and had a solid understanding of its financial condition.

53.    American Realty's largest and most prominent merger during the Relevant Period was with Cole, Inc. ("Cole Merger").   On October 22, 2013, American Realty and Cole, Inc. entered into an Agreement and Plan of Merger ("Cole Merger Agreement"), which provided that Cole, Inc.'s shareholders would receive 1.0929 shares of American Realty common stock or $13.82 for each Cole, Inc. share.

54.    Defendants repeatedly represented to investors that the Cole Merger was beneficial to Cole, Inc. and American Realty shareholders, urging Cole, Inc.'s shareholders to approve the merger and exchange their shares.   In SEC filings filed in connection with the Cole Merger, American Realty highlighted how the merger would result in "AFFO Growth."   In a press release accompanying the Cole Merger, Defendant Schorsch stated that American Realty was the "new industry leader" and committed to "drive value for stockholders by placing their interests ahead of our own, aligning pay with performance, and reporting fully and transparently."   Schorsch further represented that the Cole Merger would enable American Realty to "deliver AFFO per share earnings accretion through further cost of capital advantages" and "improve our AFFO multiple." On a conference call with analysts and investors days later, Defendant Schorsch again touted the Cole Merger as "an epic transaction" and a "win-win to the shareholders."   Defendant Block reiterated this point, telling investors that the Company's AFFO after the merger would be "$1.13 to $1.19 per share."

55.    On November 5, 2013, Defendants filed with the SEC a registration statement on Form S-4/A related to the Cole Merger ("Cole Registration Statement").   On December 23, 2013, the Company also filed with the SEC a Joint Proxy Statement/Prospectus to Cole, Inc. shareholders

("Cole Merger Proxy").  The Cole Registration Statement and Cole Merger Proxy made numerous representations to investors regarding the Cole Merger, including the financial data for American Realty for the first nine months ended September 30, 2013.  The materials represented that the "unaudited financial statements include all adjustments (consisting of normal recurring adjustments) necessary for a fair presentation of the interim September 30, 2013 financial information."

56.     Additionally, the Cole Merger Agreement – which was attached to both the Cole Registration Statement and the Cole Merger Proxy and was incorporated by reference in both documents – represented that American Realty's SEC filings and the financial data within those filings were free of material misstatements and omissions.  They further represented that American Realty had a system of internal accounting controls that was effective, reliable and sufficient to ensure that American Realty's financial statements were accurate.  Among other things, they assured investors that American Realty and its executives had "devised and maintain a system of internal accounting controls sufficient to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP."

57.     The Cole Merger closed on February 7, 2014.  Unknown to shareholders, American Realty's financial performance was "faltering," it was overstating its AFFO by material amounts, and it lacked the represented financial controls necessary to ensure its disclosures were truthful and complete.

**D. American Realty's Acquisition Binge Was Highly Profitable For Defendant Schorsch's Empire And American Realty's Executives**

58. American Realty's dramatic growth generated hundreds of millions of dollars in transactional fees and "performance-related" compensation payments for Defendant Schorsch and his entities.

59. The American Realty "acquisition machine" was designed to and did effectively transfer hundreds of millions of dollars from the Company to entities owned or controlled by Defendants Schorsch and Block, and other senior executives. Over a period of just three years, the Company paid ARC Advisors "and its affiliates" over ***$900 million*** – largely for supposedly acquisition-related "commissions," "fees," "services," and "expenses." This complex and opaque web of interrelated companies included such similarly named affiliates as ARC Advisors; AR Capital; RCS Securities; RCS Advisory Services, LLC; ARC Advisory Services, LLC; American Realty Capital Advisors III; American Realty Capital Advisors IV, LLC; American National Stock Transfer, LLC; and ARC Real Estate Partners, LLC.

60. For example, in 2012 and 2013, American Realty transferred to ARC Advisors (headed by Schorsch) "and its affiliates": (i) $240 million for "subordinated distribution fees" and "strategic advisory services," purportedly in connection with the ARCT III and ARCT IV mergers; (ii) more than $66 million for "acquisition related expenses"; (iii) $119 million for "general and administrative expenses"; and (iv) $31 million for "management fees." Similarly, in connection with the Cole Merger, Schorsch's entities obtained a $32 million payout, including $28 million to RCS Securities for "financial advisory and strategic services"; $2.9 million to RCS Advisory Services, LLC for "transaction management services"; and $750,000 to RCS Securities and RCS Advisory Services, LLC together for their "[r]etention as non-exclusive advisor and information agent."

61.     Two of American Realty's final cash transfers to ARC Advisors and its "affiliates" underscore Defendants' fraudulent scheme to tax the Company with hundreds of millions of dollars in improper fees and services, thus lining the pockets of Schorsch, Block and other senior executives.  In 2014, the Company paid $20 million to ARC Advisors and its affiliates solely to switch from external management to internal management. This $20 million payment was evenly split between "post-transaction support services" and "furniture, fixtures, and equipment," which the Company acknowledged could not be substantiated or supported by documentary evidence.

62.     The Company's executives also personally profited from American Realty's acquisition binge.  Over intense shareholder objection, the Company adopted a 2014 Multi-Year Outperformance Plan ("OPP"), which tied executive compensation to the Company's size and reported AFFO.  When the Company's stock price rose as it acquired more companies and recorded higher AFFO, the Company's executives profited.

63.     More specifically, the OPP was divided into two components:  one "absolute" and one "relative."  Each component was measured over a three-year period based on share price appreciation and common stock distributions.  If American Realty achieved a total return to stockholders of more than 7% a year, the plan paid out 4% of the dollar amount of the total return exceeding that benchmark.  Further, if the Company's annual performance exceeded the median total return of a group of peer companies by six percentage points or more, then the OPP paid out an additional 4% of that excess total return.  Under the second "relative" component, the plan paid participants (including Schorsch and Block) 50% of their incentive compensation even if the Company posted *no* cumulative return to stockholders.  Notably, the Compensation Committee allocated the bulk (42.5%) of the OPP's $120 million executive-incentive compensation pool to Schorsch.

64.    In total, the proposed OPP provided an executive-incentive compensation pool of $222.1 million for 2014, with 42.5% of the pool allocated to Defendant Schorsch.  This incentive compensation was in addition to: (i) Defendant Schorsch's base salary of $1.1 million; (ii) an estimated $8.8 million of non-guaranteed cash bonus and equity awards; and (iii) a "retention grant" worth $24.9 million.  Schorsch's total awarded compensation for 2014 alone was estimated at $28.4 million, assuming he achieved only the midrange of the OPP plan, or almost 26 times his guaranteed salary of $1.1 million.

65.    American Realty adopted the OPP, notwithstanding a 67.6% non-binding shareholder vote *rejecting* the OPP and a May 16, 2014 Institutional Investor Services ("ISS") report criticizing the plan.  As the ISS explained, the OPP plan was not "rigorous relative to the potential payout values."  American Realty nevertheless adopted the OPP, with a recently disclosed December 12, 2014 agreement between Schorsch and the Company revealing an "Award Agreement dated January 8, 2014, under the American Realty 2014 Multi-Year Outperformance Plan."  Through this OPP – as well as various other forms of compensation, director fees, and profit arrangements that accompanied each acquisition – the Executive Defendants personally profited from their fraud.

### E.    American Realty Rebukes Doubters And Assures Investors That The Company's Internal Controls Are Effective And Functioning Properly

66.    Throughout the Relevant Period, American Realty told investors that its internal controls were effective and functioning properly, and that its financial statements were accurate. Each of its financial statements filed with the SEC during the Relevant Period contained representations that Defendants Schorsch and Block personally "evaluated" and determined that "the [Company's] disclosure controls and procedures are effective."  Defendants Schorsch and Block also signed SOX Certifications that were included in each financial statement.  These

Certifications affirmed the purported accuracy of American Realty's financial statements, and also assured investors that Defendants Schorsch and Block had designed and implemented internal controls over financial reporting necessary to ensure that American Realty's financials were reliable and complied with GAAP.

67.    In response to selected investor concerns, the Executive Defendants continued to assure the market about the soundness of the Company's internal controls over financial reporting, specifically emphasizing American Realty's supposed focus on internal financial controls, corporate governance, and shareholder transparency.    By way of example, on May 19, 2014, American Realty filed a Form 8-K that included inaccurate pro forma financials for the spin-off of its multi-tenant shopping center business.  The Company was forced to admit the misstatements shortly thereafter, acknowledging that American Realty's published financial statements included an inaccurate weighted share count, which had the effect of boosting the Company's earnings by approximately *30%*.    Only days later, American Realty refiled a preliminary prospectus supplement with the SEC relating to its May 2014 Offering, which the Company admitted had misstated closing costs and expenses by nearly *$100 million*.

68.    When investors voiced concerns about these lapses, American Realty's executives assured them that they were isolated instances and that investors should be confident in the accuracy of the Company's reported financials and the integrity of its controls.  For example, on June 2, 2014, Marcato Capital Management LP, one of the Company's largest shareholders, sent a letter to American Realty questioning the effectiveness of the Company's financial controls following its rapid acquisitions.  The letter expressed concern that "the Company itself seemingly cannot keep its own financials straight" and criticized the Company's "disorderly financial controls exposed by [its] second material disclosure error in as many weeks."  American Realty responded

to these concerns with a series of letters to the Company's shareholders, as well as SEC filings that continued to represent to investors that the Company's financials were accurate, that the Company was committed to sound corporate governance, and that there were no flaws in any internal controls.  Unfortunately, none of this was true.  As shareholders ultimately learned, Defendant Schorsch was not committed to correcting the weaknesses in the Company's financial and reporting controls; rather, he was devoted to making the Company's financials appear as strong as possible, even if that required fabricating its most critical and closely watched financial metric.

**F.    Unknown To Investors At The Time, American Realty Intentionally Misstates The Company's AFFO**

69.    When calculating AFFO, a company is allowed to "add back" certain transaction and financing costs not associated with operations.  When a company has a fractional ownership interest in an operating partnership, however, it is only allowed to "add back" its *pro rata* share of the operating partnership's transaction and financing costs.  This is known as calculating AFFO on a "net" basis.  This method of calculation differs from a "gross" basis calculation.  When AFFO is calculated on a "gross" basis, the company reports income associated with the entirety of an operating partnership and "adds back" the entirety of the transaction and financing costs.

70.    As discussed above, during the Relevant Period, American Realty specifically represented to investors in its SEC filings that it calculated AFFO on a "net" basis – ***not*** a "gross" basis.  Unbeknownst to investors, these representations were false.  In a December 18, 2014 verified complaint, American Realty's former CAO, Defendant McAlister, explained that the Company improperly began calculating AFFO on a gross basis – rather than a net basis – "in the fourth quarter of 2013 ('2013 Q4'), and possibly in earlier quarters."  This change, McAlister admitted, was made "***suddenly and without any apparent justification or basi***s."  Through this change, the Company began improperly "add[ing] to and increas[ing] the Company's AFFO by

29

the entirety of the added-back costs, including the portion thereof that should have been attributed to non-controlling interests in the operating partnership."   In so doing, the Company materially overstated its AFFO and provided investors with a distorted picture of the Company's financial condition and the supposed benefits of the Company's numerous acquisitions.

71.   American Realty changed its AFFO calculation, McAlister explained, to mask the true facts about its financial condition, which were unknown to investors at the time.   Contrary to its repeated claims of "record" AFFO and successful acquisitions, the Company's financial performance was *"faltering"* during the Relevant Period and its acquisitions were a negative drain on its bottom line.   The Company's accounting improprieties, as McAlister has admitted, were necessary "*to avoid public disclosure of the Company's faltering financial performance*."

72.   American Realty's top executives were fully aware of, and participated in, the Company's fraudulent accounting.   As set forth in McAlister's verified complaint, when she alerted the Company's former CEO, Defendant Kay, to the Company's improper accounting of AFFO, he directed her and Defendant Block "*not to change or correct the fraudulent reports*."   Defendant Schorsch similarly instructed Defendants Block and McAlister not to correct the Company's fraudulent financials.   As McAlister recounted, on or about July 28, 2014, Defendant Schorsch "*directed Mr. Block [during a telephonic conference call] to conceal the previous improper reporting*."

73.   The Company perpetuated its accounting fraud by devising ways to conceal it from investors.   According to McAlister, Defendant Schorsch instructed CFO Block "*to take steps to cover up the improper change in accounting and unlawfully misleading financial reports*."   Defendants Schorsch and Kay also directed Block and McAlister to "change[] the beginning point for its AFFO calculation from 'net loss attributable to stockholders (in accordance with U.S.

GAAP)' to 'net loss (in accordance with U.S. GAAP).'"  The goal of these changes, McAlister has revealed, was to ***"ma[k]e it more difficult for stockholders to see the fraudulent change in the add-backs of non-recurring transaction and deferred financing costs***."

74.    American Realty and its top executives also threatened, intimidated, and terminated employees who attempted to interfere with the Company's fraud.  Defendant McAlister has explained how she "repeatedly expressed her concerns regarding Mr. Schorsch's instruction to shift and reallocate the funds in the 2014 Q2 report."  When these issues were raised, however, "members of senior management either ignored Ms. McAlister's concerns regarding erroneous accounting practices, or berated Ms. McAlister for calling attention to them."  Indeed, shortly after "blowing the whistle," McAlister was "retaliat[ed]" against and terminated as the "scapegoat."

75.    In July 2014, Defendant McAlister explained that she emailed Jessica Estrada, a Manager at Grant Thornton, and informed her of the false and misleading nature of American Realty's financial statements.  Rather than investigate, Grant Thornton Partner Richard LeFleur and Ms. Estrada directed Defendant McAlister to sign and file with the SEC the Company's Second Quarter 2014 Form 10-Q and file the accompanying false financial statements.

### G.    American Realty's Audit Committee Discloses That Its Top Officers Intentionally Misrepresented The Company's AFFO

76.    Investors began to learn the true facts about American Realty's accounting fraud on October 29, 2014.  That morning, American Realty issued a press release that contained a series of startling admissions.  The press release revealed for the first time that the Company's Audit Committee had conducted "an investigation into concerns regarding accounting practices and other matters."  Based on its investigation, the Audit Committee concluded that the Company's previously issued financials "***should no longer be relied upon***," including its financial statements for 2013 and the first and second quarters of 2014.

77.    The Audit Committee retained independent counsel and forensic experts to conduct the investigation.  Through their investigation, the Audit Committee determined that the Company "incorrectly included certain amounts related to its non-controlling interests in the calculation of AFFO" and, as a result, overstated AFFO.  The Audit Committee further found that "[1] this error was *identified but intentionally not corrected*, and [2] other AFFO and financial statement errors were *intentionally made*, resulting in an overstatement of AFFO and an understatement of the Company's net loss for the three and six months ended June 30, 2014."

78.    The Audit Committee also revealed that the Company's CAO, Defendant McAlister, and CFO, Defendant Block, had been terminated.  These officers, the Audit Committee made clear, were implicated and responsible, at least in part, for the Company's accounting fraud. Indeed, because of these Defendants' "key roles in the preparation of [the fraudulent] financial statements," the Audit Committee concluded that the Company's earlier financials prepared by these Defendants merited additional review and should not be relied upon.  The Audit Committee cautioned that the Company's upcoming review "*could identify further adjustments in addition to those discussed above*."

79.    The Company's Audit Committee further found that American Realty's internal controls over financial reporting were materially deficient.  On this subject, the Audit Committee explained that "the Company is reevaluating its internal control over financial reporting and its disclosure controls and procedures" and "intends to make the necessary changes to its control environment to remediate all control deficiencies that are identified as a result of the ongoing investigation and the restatement process."

80.    After issuing its press release on October 29, 2014, American Realty held a conference call with investors to discuss the Company's revelations.  During the call, Defendant

Kay adopted and repeated the Audit Committee's findings set forth in the Company's press release. He explained how, on September 7, 2014, an American Realty employee contacted the Audit Committee and reported accounting improprieties.  He further explained that, for the first quarter of 2014, AFFO was supposed to be calculated on a "net" basis, with any adjustments to net loss multiplied by approximately 96.5% to reflect American Realty's interest in the Operating Partnership.  As Defendant Kay admitted, however, American Realty improperly calculated AFFO on a "gross" basis during the first quarter of 2014, making adjustments to net loss based on the full results of the Operating Partnership.  As a result, American Realty added back more adjustments than it should have, which resulted in an improperly inflated AFFO.  Defendant Kay further admitted that the Company's fraudulent accounting improperly increased AFFO for the first quarter of 2014 by $17.6 million, artificially inflating AFFO to $0.26 per share when it should have been only $0.23 per share.  The Company again fraudulently manipulated its financials in the second quarter of 2014 by, among other things, moving approximately $10.5 million of second quarter 2014 expenses to the third quarter of 2014 to "***conceal the error from the [prior] quarter***."  In so doing, the Company reported an artificially low net loss for the second quarter of 2014.  As Defendant Kay acknowledged, "***we had some bad judgment there***."   Defendant Kay also attempted to assure the market that the Company had the issue under control and that "[n]one of the executives that are currently at the Company have been implicated during the investigation related to the concealment of that error."

81.    Analysts were stunned by the Company's October 29, 2014 disclosures.  Wells Fargo Securities reported that "this morning's announcement will be a significant setback for the company in terms of earning or maintaining investor trust, credibility, and allaying investor skepticism."   JMP Securities similarly concluded that an "Accounting Fraud [had been]

uncovered," and that "management's credibility, which was already under scrutiny, took a further impairment." Analysts at J.P. Morgan Securities further concluded that, as a result of the revelation of the accounting fraud, "[American Realty]'s credibility is likely impugned for some period of time," and "capital costs will be higher in the near term . . . thus making growth more difficult." Commentator Jim Cramer remarked that, when he read the Company's disclosure, his "heart jump[ed] out of [his] throat" because the October 29 disclosure made clear that American Realty's senior executives "knew and did nothing" to correct the Company's misstatements.

82.    Credit rating agencies also responded swiftly to the Company's disclosures.  Within hours of the news, Standard & Poor's placed American Realty's debt rating on downgrade "watch." Moody's also placed the Company's corporate debt rating under review, explaining that the "purposeful hiding of the accounting error engenders questions about the company's credibility and maintenance of investor trust."

83.    Federal and state regulators also responded to the Company's revelations.  After the close of trading on October 29, 2014, *The Wall Street Journal* reported that the SEC "intends to launch an inquiry into the accounting irregularities" at American Realty.  As *The Wall Street Journal* explained, "the revelation is a black eye for Mr. Schorsch, chairman of American Realty Capital and one of the biggest real-estate investors in the U.S."  The following day, analysts at Ladenburg Thalmann stated that the revelations were "highly disappointing" and noted that, per *The Wall Street Journal* article, "[m]ore shoes could drop as probe could find additional issues and more agencies get involved."  Indeed, on October 31, 2014, *Reuters* reported that the FBI and the U.S. Attorney's Office for the Southern District of New York had now "opened a criminal probe of [American Realty] in the wake of the real estate investment trust's disclosure that it had uncovered accounting errors."

84.    The Company's revelations and accounting fraud severely impacted its business operations.  On November 3, 2014, American Realty announced that RCS Capital had terminated its $700 million agreement to purchase an American Realty subsidiary, Cole Capital.   In terminating the agreement, RCS Capital cited the "recent disclosures by [American Realty] on October 29, 2014, and the matters arising with respect to such disclosures."

85.    The Company's October 29, 2014 revelations caused the price of American Realty's stock to decline markedly.  On the day of the press release, American Realty's stock price dropped from $12.38 to $10.00, a decline of more than *19%*, on extremely high trading volume of 231 million shares.  The stock price fell by an additional *17%* during the next three trading days, as more revelations were made and the impact of the accounting fraud was further disclosed and appreciated by investors.  In total, the Company's disclosures caused the Company's stock price to fall by over *36%* in only three trading days, erasing over *$4 billion* in market capitalization. The prices of American Realty Swaps suffered substantially similar or equivalent declines.

### H.    <u>Defendants Schorsch, Kay And Beeson Unexpectedly "Resign"</u>

86.    The impact of the Company's accounting fraud continued to be felt.  The Company committed to restate its financials by November 2014, but failed to do so.  This failure prompted the NASDAQ to issue a notice admonishing the Company that it was "not in compliance with NASDAQ Listing Rule 5250(c)(1) that requires timely filing of reports with the [SEC]."

87.    On December 15, 2014, the Company announced that its founder, Defendant Schorsch, its CEO, Defendant Kay, and its COO, Defendant Beeson, had all "resigned," effective immediately.  The press release announcing these unexpected "resignations" made clear that the Company's Board of Directors wanted no further dealings with these culpable executives.  In announcing their unexpected departures, the Company's press release explained that these long-time American Realty executives were immediately relieved from their "employment or board

positions held with the Company, its subsidiaries and certain Company-related entities." The press release further assured investors that, "[i]n connection with Mr. Schorsch's departure as Executive Chairman, American Realty will be unwinding all of its relationships with entities in which Mr. Schorsch maintains an executive or director-level role or is a significant stockholder."

88.     Thus, within six weeks of the Restatement, ***every senior executive employed by the Company during the Relevant Period*** – its Chairman, CEO, COO, CFO, and CAO – had been asked to leave the Company or been terminated, with the former CAO ***suing the Company*** for terminating her after she "blew the whistle" on the accounting fraud.

I.     **American Realty Confirms That It Falsified Four Years Of <br> <u>Financials And Suffered Material Weaknesses Over Internal Controls</u>**

89.     On March 2, 2015, American Realty's new management issued a press release and held an investor conference to announce the final results of the Restatement. In its "Business Update," the Company admitted that "AFFO was overstated for 2011, 2012, 2013 (including each fiscal quarter of 2013) and the first two quarters of 2014." In other words, Defendants falsely reported AFFO throughout ***<u>the entirety</u>*** of the Company's four-year history. The Restatement quantified the material amounts by which Defendants overstated the Company's AFFO each year. In 2011, AFFO was overstated by 7.7%; in 2012, AFFO was overstated by 2.7%; in 2013, AFFO was overstated by 23%; in the first quarter of 2014, AFFO was overstated by 35%; and, in the second quarter of 2014, AFFO was overstated by 10.4%. The Restatement also confirmed that the Company engaged in myriad GAAP violations and financial artifices during the Relevant Period, including:

(a)     The Company regularly and improperly classified ordinary business expenses as "merger-related," which inflated AFFO and gave investors the false impression that such expenses were non-recurring in nature. As

restated, the expenses were reclassified as general and administrative expenses.

(b)     Numerous expenses were recorded in the incorrect accounting period, effectively delaying expense recognition and understating reported expenses.

(c)     On multiple occasions, the Company improperly classified management fees to affiliates as being merger and other non-routine transaction-related expenses, which masked related-party transactions, inflated AFFO, and gave investors the false impression that such expenses were non-recurring in nature. As restated, the expenses were reclassified as management fees to affiliates.

(d)     On multiple occasions, the Company improperly recorded merger and other transaction-related expenses as deferred financing costs. Pursuant to the Restatement, additional interest expense was recorded of $0.6 million, $2.3 million, $8.7 million, and $1.3 million for the periods of 1Q13, FY13, 1Q14, and 2Q14, respectively.

(e)     On multiple occasions, the Company improperly recorded payments to Schorsch-controlled entities as being for the acquisition of furniture, fixtures and equipment, and included those purported assets on its books, notwithstanding that there was "no evidence of the receipt" to substantiate the existence of any such assets. The Company restated the payments by writing off the amounts.

90.     The Company further admitted in the Restatement that its controls over financial reporting and disclosure had suffered – and continued to suffer – from a "material weakness." A "material weakness," the Restatement explained, "is defined as a deficiency, or a combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis." The Company admitted that its "disclosure controls and procedures were *not properly designed or implemented* to ensure that the information contained in the Company's periodic reports and other SEC filings correctly reflected the information contained in the Company's accounting records and other supporting information and, in the case of AFFO per share (a non-GAAP measure that is an important industry metric) was correctly calculated." On this subject, the Company further admitted that "the Company *did not have appropriate controls to ensure that its SEC filings were reviewed on a timely basis* by senior management or that significant changes to amounts or other disclosures contained in a document that had previously been reviewed and approved by the Audit Committee were brought to the attention of the Audit Committee or its Chair for review and approval before the document was filed with the SEC." Finally, the Company admitted that it "*did not have appropriate controls over the formulation of AFFO per share guidance* or the periodic re-assessment of the Company's ability to meet its guidance."

91.     The Company further admitted that the "*Company did not maintain the appropriate controls to assess, authorize and monitor related party transactions, validate the appropriateness of such transactions or, manage the risks arising from contractual relationships with affiliates.*" As the Company explained, "[w]ithout the appropriate controls, the Company made certain payments to the Former Manager and its affiliates that were not sufficiently

documented or that otherwise warrant scrutiny." The Company further explained that "[t]he Audit Committee's investigation identified certain payments made by the Company to the Former Manager [ARC Properties Advisors, LLC] or its affiliates that were not sufficiently documented or otherwise require scrutiny," including lease payments of $8.5 million relating to a former manager in a building located in Newport, Rhode Island, that the Company *never occupied*.

92.     In addition, the Company admitted that it *"did not maintain appropriate controls over various grants of equity-based compensation."* The Company recounted how, "[i]n the fourth quarter of 2013, in anticipation of the Company's transition to self-management, the Company entered into employment agreements with the Company's former Executive Chairman and Chief Executive Officer and its former Chief Financial Officer . . . and also approved the 2014 Multi-Year Outperformance Plan pursuant to which awards were made to them on January 8, 2014." Because the Company lacked "the appropriate controls, these documents contained terms that were inconsistent with the terms authorized by the Compensation Committee." In addition, "the Company did not obtain copies of or administer the equity awards made by means of block grants allocated by the Former Manager and its affiliates, nor did it review the awards for consistency with the Compensation Committee's authorization."

93.     The Company also confirmed in its Restatement that the SEC has "commenced a formal investigation and issued subpoenas calling for the production of various documents" and that "the United States Attorney's Office for the Southern District of New York contacted counsel for the Audit Committee and counsel for the Company with respect to this matter." The Company further disclosed that "the Secretary of the Commonwealth of Massachusetts issued a subpoena calling for the production of various documents."

## V.    ADDITIONAL ALLEGATIONS OF SCIENTER

94.    Defendants American Realty, ARC Properties, Schorsch, Kay, Block, Beeson and McAlister acted with scienter with respect to the materially false and misleading statements and omissions discussed herein.

95.    American Realty has admitted that the Company acted with scienter when it issued false and misleading financials.    As discussed above at ¶¶8, 76, 77, the Company's October 29, 2014 press release stated that its executives had "identified" misstatements in the Company's financials, but nevertheless "intentionally" did not correct them.    The Company has further admitted that the misstatements in its financials during the second quarter of 2014 were "intentionally made" and deliberately concealed from investors.    In addition, the Company has recognized that its internal controls over financial reporting and public disclosure were materially deficient – a fact which the Company and its top officers knew or were severely reckless in not knowing.    Indeed as discussed above at ¶¶78-80, the Company had already identified multiple errors in its financials, and Schorsch and his entities had been improperly using his network of related entities to complete various self-dealing transactions.

96.    Defendant Schorsch was American Realty's founder, CEO, and Chairman and, as such, was intimately familiar with, and exercised substantial control over, every aspect of American Realty's business, including its calculation and reporting of AFFO and the effectiveness of the Company's internal controls over financial reporting.    As discussed herein, Defendant Schorsch directed American Realty's CFO, Defendant Block, to improperly report the Company's AFFO.    Defendant Schorsch also directed Defendant Block and others to conceal the Company's improper accounting by fraudulently deferring the accrual of second quarter expenses.    Knowing these facts, Defendant Schorsch nevertheless certified the accuracy of American Realty's financial results and the adequacy of its internal controls in American Realty's financial filings throughout

the Relevant Period.  Defendant Schorsch's scienter is further demonstrated by the decision of American Realty's independent directors on or about December 15, 2014, to sever all ties between American Realty and Defendant Schorsch and ask him to "step down."

97.    Defendant Block was American Realty's CFO, and, as such, had ultimate responsibility for American Realty's finances.  In addition, Defendant Block was intimately familiar with, and exercised substantial control over, American Realty's business, including its calculation and reporting of AFFO and the effectiveness of its internal controls over financial reporting and disclosure.  As discussed herein, Defendant Block became aware by no later than February 2014 that American Realty's financial statements contained errors related to the calculation of AFFO, yet he did nothing to correct those errors.  In fact, Defendant Block continued to certify the accuracy of American Realty's financial statements, as well as the adequacy of American Realty's internal controls throughout the Relevant Period, despite knowing that the Company's financial statements did not accurately reflect the Company's true financial condition. In addition, as discussed above at ¶7, 80, Defendant Block attempted to conceal the Company's improper accounting by converting to the "gross" method of reporting AFFO and fraudulently deferring the accrual of second quarter expenses.  As the Audit Committee explained in its October 29, 2014 disclosure, Block had a "key role[] in the preparation" of the fraudulent reports, which led to his immediate termination and necessitated a review of prior financial statements that he had approved.

98.    Defendant McAlister, American Realty's CAO, was a member of American Realty's senior management, and was in charge of American Realty's accounting.  As Defendant McAlister admitted in her verified complaint, by no later than February 2014, she knew that American Realty's financial statements contained errors related to the calculation of AFFO, yet

she failed to correct those errors.  Defendant McAlister also was fully aware that Defendant Schorsch directed Defendant Block to conceal the improper accounting by converting to the "gross" method of reporting AFFO and fraudulently deferring the accrual of second quarter expenses.  Defendant McAlister nevertheless signed the Second Quarter 2014 Form 10-Q despite knowing of the fraudulent accounting contained in the Company's financials.  As the Audit Committee explained in its October 29, 2014 disclosure, McAlister had a "key role[] in the preparation" of the fraudulent reports, which led to her immediate termination and necessitated a review of prior financial statements that she had approved.

99.    As American Realty's President and CEO, Defendant Kay was a member of American Realty's senior management, was responsible for the Company's day-to-day operations, and was familiar with American Realty's internal controls.  As discussed herein, Defendants Block and McAlister brought the improper AFFO accounting to Defendant Kay's attention by no later than February 2014.  In response, however, "Mr. Kay told Ms. McAlister and Mr. Block *not* to change or correct the fraudulent reports, in an apparent effort to avoid public disclosure of the Company's faltering financial performance."  As the result of his day-to-day control over American Realty, Defendant Kay also knew, or was reckless in not knowing, that Defendant Schorsch directed Defendants Block and McAlister to conceal the improper accounting by converting to the "gross" method of reporting AFFO and fraudulently deferring the accrual of second quarter expenses.  Defendant Kay's scienter is further demonstrated by the fact that he was asked to step down from his position at American Realty on or about December 15, 2014.

100.    As American Realty's President and COO, Defendant Beeson was a member of American Realty's senior management, was responsible for the Company's day-to-day operations, and was familiar with American Realty's internal controls.  As discussed herein, Defendant

42

McAlister, by her own admission, brought the improper AFFO accounting to Defendant Beeson's attention by no later than February 2014, specifically informing Beeson that in the 2013 Annual Report American Realty had misrepresented AFFO.  As the result of her day-to-day control over American Realty, Defendant Beeson also knew, or was reckless in not knowing, that Defendant Schorsch directed Defendants Block and McAlister to conceal the improper accounting by converting to the "gross" method of reporting AFFO and fraudulently deferring the accrual of second quarter expenses.  Defendant Beeson's scienter is further demonstrated by the fact that she was asked to step down from her position at American Realty on or about December 15, 2014.

101.    Further facts support a strong inference of scienter for the Defendants listed above. As detailed above, American Realty and its executives repeatedly told investors that the Company had achieved "record" AFFO, emphasizing that this financial metric was a particularly important measure to evaluate the Company's stock.  As summarized above, at each reporting period during the Relevant Period, these Defendants singled out the Company's purportedly strong AFFO.  These Defendants were aware of the fact that the market was relying on these statements, as analysts published numerous reports that underscored the Company's "record" AFFO.  Given that these Defendants repeatedly stressed to investors that AFFO was a critical measure of the Company's financial health, any failure to confirm that their repeated statements about the Company's AFFO were materially accurate supports an inference of recklessness, at a minimum.

102.    The nature, duration, and scope of Defendants' misconduct further supports a strong inference of scienter.  As admitted in the Restatement, the Company falsified its reported operating performance and financial statements for ***each and every reporting period*** since the Company went public in 2011.  The Company has further acknowledged that its financial statements during the Relevant Period (and beforehand) were riddled with accounting errors and/or financial

manipulations, resulting in understated net losses attributable to stockholders by as much as 26% in certain quarters.  Likewise, the Company has admitted that it overstated its AFFO per share each and every year during the Relevant Period, with the overstatement reaching as much as *100%* in certain quarters.

103.    Moreover, the Company has admitted that management was aware of certain errors that "*were intentionally not corrected*," and that other "*errors were intentionally made*."  Finally, the accounting scheme allowed management to pursue and execute a rapid-fire, growth-by-acquisition strategy that generated over *$900 million* in fees, commissions, and incentive compensation – a clear motive to commit fraud.

104.    The Restatement is an admission that: (i) the Company's Relevant Period financial statements and the Executive Defendants' public statements regarding those results were *materially* false and misleading; and (ii) the financial statements reported during the Relevant Period were incorrect *based on information available to the Defendants at the time the results were originally reported.*    American Realty's Restatement contains numerous indicia of Defendants' scienter, including but not limited to:

(a)    **The type of restatement** − The restated items at issue were not due to any mathematical error, or honest misapplication of a complex accounting standard.  Rather, as set forth above, the Restatement resulted from a host of deliberate accounting manipulations and misrepresentations in American Realty's financial statements that concern the most important financial metrics for investors – including the single most critical metric for investors in REITs – and encompass serious and repeated misapplications of GAAP accounting, which caused net loss to be materially understated for 2013 and contributed to the material overstatement of AFFO in 2013 and 2014.

(b)     **The duration over which the improper accounting was perpetrated** −
As detailed herein, the Restatement does not hinge on an honest mistake or oversight during a single quarter or even a single year that was later corrected on a good faith basis.  Rather, American Realty was forced to restate its financial statements to correct accounting improprieties that covered seven consecutive reporting periods: (1) the year ended December 31, 2012; (2) the year ended December 31, 2013; as well as the quarters ended (3) March 31, 2013; (4) June 30, 2013; (5) September 30, 2013; (6) March 31, 2014; and (7) June 30, 2014.  Additionally, American Realty was forced to admit that it had falsified its reported operating performance and/or financial statements for every reporting period since it went public in 2011.

(c)     **The types of accounting gimmicks employed** − As detailed herein, the improper accounting corrected by this Restatement did not occur as a result of good faith differences in accounting judgments, or interpretations of complicated, vague or arcane accounting rules, and the Company does not claim otherwise.  Rather, as American Realty has acknowledged, the Company's Relevant Period financial statements were replete with accounting errors and/or financial manipulations which violated clear and well-established expense recognition standards.  The number of accounting tricks employed by Defendants during the Relevant Period reaches into the several dozen, and includes:

- Recording numerous expenses in the incorrect accounting period, effectively delaying expense recognition and understating reported expenses.

- Misclassifying ordinary business expenses as "merger-related," which inflated AFFO and gave investors the false impression that such expenses were non-recurring in nature.

- Misclassifying management fees to affiliates as being merger and other non-routine transaction-related expenses, which masked related-party transactions, inflated AFFO, and gave investors the false impression that such expenses were non-recurring in nature.

- Improperly recording merger and other transaction-related expenses as deferred financing costs, which should have been capitalized and amortized in the amounts of $1.0 million, $0.2 million, $5.9 million, $20.6 million, and $0.8 million for the periods of 1Q13, 3Q13, FY13, 1Q14, and 2Q14, respectively.

- Recording payments to Schorsch-controlled entities as being for the acquisition of furniture, fixtures and equipment, and including those purported assets on its books, notwithstanding that there was "no evidence of the receipt" to substantiate the existence of any such assets.

Among the myriad accounting gimmicks employed by the Company, the manner in which the Company understated net losses by understating expenses is a clear example of how the Company violated basic and fundamental rules of accounting.  In violation of the basic tenet of accrual accounting that expenses be recorded in the same period in which the corresponding benefit is realized,[4] American Realty systematically engaged in a scheme of improper timing of expense recognition by either understating its expenses in a current period or improperly delaying expense recognition for as long as possible.

(d)    **The income statement effect of the misstatements** − Most or all of the Company's purported accounting "errors" had the effect of improving, not worsening, operating results, including but not limited to: (i) American Realty's operating loss; (ii) loss from continuing operations; (iii) net loss; (iv) net loss per share; (v) AFFO; and (vi) AFFO per share.

(e)    **The false SOX certifications –** In addition to the Executive Defendants' knowledge of the Company's violations of basic accounting principles, Defendants Schorsch's and Block's SOX Certifications attached to American Realty's Forms 10-Q, Forms 10-K, and Registration Statements also evidence scienter.  As set forth above, Schorsch and Block certified that they had personally reviewed American Realty's financial statements, designed and evaluated

---

[4] *See* Financial Accounting Statements Board Statement of Financial Accounting Concepts No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises,* ¶¶85, 87, and Accounting Standards Codification ("ASC") Topic 450-20, *Loss Contingencies.*

American Realty's disclosure controls, and evaluated American Realty's internal controls over financial reporting. Such reviews and evaluations, if performed as represented, would have alerted the Executive Defendants to American Realty's glaring accounting misstatements and material weaknesses in internal and disclosure controls that were subsequently admitted. The Executive Defendants either knew of the material misstatements in the financial statements, the ineffectiveness of the disclosure controls, and the material weaknesses in internal controls, **or** knowingly failed to perform the required review of the financial statements, evaluation of internal controls and evaluation of disclosure controls and falsely represented that they had. In either case, the Executive Defendants knew or recklessly disregarded that the SOX Certifications Schorsch and Block signed were false and misleading.

(f)     **The Audit Committee Investigation found that the financial misstatements were intentional** – The Company *admitted* in the Restatement that senior management participated in the intentional, material misstatement of American Realty's operating performance measures, including the material misstatement of various GAAP income and cash flow-related measures. The 2013 Amended Form 10-K included, in pertinent part, the following admissions with respect to the Company's previously disclosed AFFO:

> The investigation found that Adjusted Funds From Operations ("AFFO"), a non-GAAP measure presented in the Company's SEC filings and other financial communications, was overstated for fiscal year 2011, fiscal year 2012, fiscal year 2013 (including each fiscal quarter of 2013) and, as previously disclosed in the October 29 8-K, the first two fiscal quarters of 2014. ***Senior management considered AFFO to be an important metric used by analysts and investors in evaluating the Company's performance and, for the first two quarters of 2014, sought to maintain reported AFFO within the 2014 guidance range of $1.13 to $1.19 per share announced at the end of 2013.*** The overstatements of AFFO were due in part to errors in reflecting amounts attributable to the limited partnership interests in the Company's operating partnership, ARC Properties Operating Partnership, L.P., held by holders other than the Company (known as non-controlling interests or "NCI"). ***Prior to the filing of the Quarterly Report on Form 10-Q for the first quarter of 2014, some members of senior management***

***were aware of NCI errors but allowed the report to be filed without completing
an analysis of the errors.***  In the Company's Quarterly Report on Form 10-Q for
the second quarter of 2014, as previously reported in the October 29 8-K, ***the NCI
errors in the first quarter were intentionally not corrected, and other AFFO and
financial statement*** errors were intentionally made, resulting in an overstatement
of AFFO and an understatement of the Company's net loss for the three and six
months ended June 30, 2014.

The Company's admissions that "some members of senior management" were "aware" of

the errors is corroborated by McAlister's whistleblower complaint, which identified those

members of senior management to include Defendants Schorsch, Kay, Block and McAlister.

105.    Finally, at least five of the Company's top executives – Block, McAlister, Schorsch,

Kay, and Beeson – including those directly responsible for its accounting, were all fired or "stepped

down" within weeks of the revelation of the accounting fraud, and the Commonwealth of

Massachusetts, SEC and DOJ are conducting on-going investigations into matters associated with

the Company's false financial reporting.

## VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS

106.    Before and during the Relevant Period, Defendants made materially false and

misleading statements and omissions concerning American Realty's financial performance and

condition, and the effectiveness of its internal controls.  These misstatements caused American

Realty shares to trade at artificially inflated prices both prior to and throughout the Relevant Period,

and allowed the Company to carry out its "growth by acquisition" strategy using inflated American

Realty shares as currency, generating hundreds of millions of dollars in transaction fees and

incentive compensation for Schorsch and other senior executives.  Specifically, as explained in

detail above and summarized below:

(a)    American Realty's financial statements were materially false and misleading and

did not accurately reflect the Company's financial performance.  In an effort to avoid public

disclosure of American Realty's faltering financial performance, American Realty changed, among

other things, its historical AFFO-calculation methodology resulting in American Realty's reported AFFO, AFFO per share, net income and earnings per share being materially inflated and false;

(b)    American Realty was not, as it represented in its financial statements, applying the "net" method of calculating AFFO.  Rather, the Company was intentionally and improperly adding back costs that were not associated with its ownership interest in the Operating Partnership;

(c)    Defendants had no reasonable basis to believe, and did not, in fact, believe, their statements detailed herein about the Company's financial performance and its 2014 AFFO estimates;

(d)    As the Company admitted in connection with its Restatement, American Realty's disclosure controls and procedures suffered from "material weaknesses" and were not properly designed or implemented to ensure that (i) AFFO per share was correctly calculated; (ii) AFFO guidance, and the Company's ability to meet that guidance, were accurate; (iii) the information in its SEC filings correctly reflected its internal accounting records; and (iv) its SEC filings were reviewed on a timely basis by senior management and that significant changes in previously reviewed documents were brought to the attention of the Audit Committee for approval before filing;

(e)    The Company's rapid pace of mergers and acquisitions during the Relevant Period "had a severe impact on the Company's control environment" and exacerbated the deficiencies in American Realty's internal controls and financial reporting processes;

(f)    American Realty's "growth by acquisition" strategy was not beneficial for American Realty shareholders, but instead was designed to generate purported transaction fees for Schorsch-controlled companies and to result in large compensation payments to executives in Schorsch-controlled companies without regard to the underlying fairness of the transaction; and

(g)     As the Company admitted in connection with its Restatement, American Realty's internal control over financial reporting suffered from "material weaknesses," which resulted in the Company failing to (i) maintain adequate controls to assess, authorize and monitor related-party transactions, validate the appropriateness of such transactions or manage the risks arising from contractual relationships with affiliates; (ii) maintain adequate controls over various grants of equity-based compensation; (iii) implement consistent policies and procedures relating to purchase accounting; (iv) establish clear reporting lines and job responsibilities or promote accountability over business process control activities; and (v) develop standardized policies and procedures for critical accounting estimates and non-routine transactions, including management review and approval of the accounting treatment of all critical and significant estimates.

### A.     False And Misleading Statements Before Plaintiffs' Purchases In The Relevant Period

107.     American Realty became a publicly-traded company on September 7, 2011.  In its initial public offering ("IPO"), the Company sold 5.58 million shares of common stock at $12.50 per share for proceeds of $69,750,000.  The registration statement for American Realty's IPO (the "IPO Registration Statement") represented that FFO was "a useful indicator of the performance of a REIT" and "that the use of FFO, together with the required GAAP presentations, provide a more complete understanding of our performance relative to our peers and more informed and appropriate bases on which to make decisions involving operating, financing and investing activities."  The IPO Registration Statement also stated that American Realty had prepared its financial statements "in conformity with accounting principles generally accepted in the United States of America [which] requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the

date of the financial statements and the reported amounts of revenues and expenses during the reporting period."

108.    During the approximately two-year period from the Company's IPO to the start of the Relevant Period, American Realty regularly issued press releases, which were filed with the SEC on Forms 8-K, announcing the Company's quarterly and annual financial results, including reported AFFO and earnings, as set forth in the table below.  After announcing its quarterly and annual financial results, American Realty also filed quarterly reports and annual reports with the SEC on Forms 10-Q and 10-K, respectively, signed by Defendants Schorsch and Block, reiterating the Company's previously reported financial results, also as set forth in the table below.  The Forms 10-Q and 10-K further represented that the financial results were accurate and presented in accordance with GAAP, and contained SOX Certifications signed by Schorsch and Block.

| Period | Document | Reported AFFO Total / Per Share | Reported Earnings (Loss) Total / Per Share |
|--------|----------|--------------------------------|--------------------------------------------|
| 3Q 2011 | 8-K filed 11/14/11 10-Q filed 11/14/11 | $287,000 / $0.17 | ($634,000) / ($0.42) |
| 4Q 2011 | 8-K filed 3/19/12 10-K filed 3/19/12 | $1.5 million / $0.23 | ($1,117,000) / ($0.17) |
| 1Q 2012 | 8-K filed 5/8/12 10-Q filed 5/9/12 | $1.6 million / $0.22 | ($630,000) / ($0.09) |
| 2Q 2012 | 8-K filed 7/31/12 10-Q filed 8/1/12 | $1.9 million / $0.25 | ($2.04 million) / ($0.28) |
| 3Q 2012 | 8-K filed 10/29/12 10-Q filed 10/29/12 | $3.1 million / $0.28 | ($804,000) / ($0.09) |
| 4Q 2012 | 8-K filed 2/28/14 10-K filed 2/28/14 | $3.4 million / $0.28 | ($7.3 million) / ($0.84) |
| 1Q 2013 | 8-K filed 5/6/13 10-Q filed 5/6/13 | $30.8 million / $0.20 (fully diluted) | ($137.9 million) / ($0.90) |

109.    Each quarter, American Realty's earnings releases also provided investors with AFFO and earnings guidance, which the Company reiterated on analyst conference calls held the same day or the following day.  For example, in the Company's March 19, 2012 earnings release

announcing financial results for the fourth quarter of 2011, American Realty stated that its "2012 AFFO should range from $0.94 to $0.96 per share."  Less than two months later, in its May 8, 2012 earnings release for the first quarter 2012, the Company announced that it was "revising its 2012 estimated AFFO per share range to $1.04 to $1.07."  Later that day, during a conference call with analysts, Schorsch stated that the 11.5% upward revision to AFFO guidance was "due to the fact that the acquisitions that we have made continue to perform."  In February 2013, the Company reported strong 2012 AFFO of $10.5 million, and declared that ARCP was "positioned for dynamic growth."  By July 2013, American Realty's senior executives were emphasizing to the market that the Company would report for 2014, "a growth rate of about 30% over 2013 AFFO per share."

110.    Defendants also repeatedly assured investors that the Company's acquisitions resulted in earnings and/or dividends that were "accretive" to stockholders, including the Company's May 8, 2012 earnings release, May 6, 2013 earnings release, May 28, 2013 earnings conference call, August 6, 2013 earnings release.

111.    The statements made in the IPO Registration Statement, 2011 Secondary Offering Registration Statement, Forms 10-K, Forms 10-Q, and releases and accompanying conference calls described in ¶¶107-10 were each false and misleading when made in that each omitted and/or misrepresented material facts.  The true facts, which were then known to or recklessly disregarded by American Realty, Schorsch and Block, were:

(a)    the reported AFFO figures were materially false and the product of accounting tricks, including unsubstantiated changes to accounting entries;

(b)    the financial statements, including reported AFFO and earnings (or losses) were materially false and misleading, did not accurately portray the Company's financial performance, and were not prepared in accordance with GAAP;

(c)      the Company lacked the internal financial and disclosure controls necessary to ensure that: (i) its SEC filings were timely reviewed for accuracy; (ii) the estimates used to formulate its reported AFFO were reasonable and appropriately calculated; (iii) its reported AFFO was accurate; (iv) its formulation of AFFO guidance was reasonable, as was the Company's periodic reassessment of the ability to meet that guidance; (v) material changes made by management to American Realty's SEC filings and public statements were approved by the Audit Committee before dissemination; (vi) the Company could assess, authorize and monitor millions of dollars of related-party transactions, overseen by Schorsch and Block, between ARC Advisors and its affiliates, each of which was owned and/or controlled by Schorsch, Block and other senior executives; (vii) the Company could calculate and track multimillion dollar grants of equity-based compensation; and (viii) the Company could undertake basic reconciliation and monitoring functions necessary to enable it to timely record and reconcile cash payments that it had received;

(d)      that Schorsch and Block were aware from their review and evaluation of the effectiveness of the Company's internal controls and financial reporting processes that the Company lacked reliable internal controls over financial reporting;

(e)      that the only way the Company could post AFFO growth at the reported levels was by making additional acquisitions using American Realty securities that were artificially inflated as a result of the wrongdoing detailed herein;

(f)      that the Company had not consistently grown its earnings (nor had its "core earnings" increased significantly), as its reported earnings and AFFO were the product of accounting manipulations;

(g)     that, as a result of (a)-(f) above, American Realty, Schorsch and Block had no reasonable basis to believe, and in fact did not believe, that American Realty's financial statements were accurate and free from material misstatements and omissions; and

(h)     that, as a result of the foregoing, American Realty, Schorsch and Block had no reasonable basis to believe, and did not in fact believe, that their AFFO guidance for the financial period at issue (let alone any increased guidance) was achievable absent the accounting manipulations described herein.

112.    In addition to the statements referenced above, Defendants made numerous other materially false and misleading statements to the market during the period between American Realty's IPO and the start of the Relevant Period.  These statements inflated the prices of American Realty shares, thus facilitating the Company's acquisition spree and enabling the Company and its top executives to reap hundreds of millions of dollars in improper transactional fees and bonuses. Thus, by the start of the Relevant Period, the market price of American Realty stock (and Swaps) was already inflated as a result of the misconduct alleged herein.

**B.      False And Misleading Statements During The Relevant Period**

**1.      Second Quarter 2013 Financial Results**

113.    On August 6, 2013, American Realty issued a press release announcing "Record Second Quarter 2013 Operating Results" ("Second Quarter 2013 Press Release").  That same day, the Company filed with the SEC a Form 8-K, which Defendant Schorsch signed, that included the press release as an exhibit.  The Second Quarter 2013 Press Release reported AFFO of $32.8 million, or $0.19 per share.  In addition, the Company raised its previously issued full-year 2014 AFFO per share estimates from a range of $1.06 to $1.10 per share, to a range of $1.14 to $1.18 per share.

114.    The Second Quarter 2013 Press Release contained the following statement by

Defendant Schorsch concerning the Company's financial results:

> The second quarter of 2013 was about deliberate and predictable execution in all
> aspects of our business . . . Our strategic vision is furthered with the completion of
> the two pending mergers, *a substantial and highly accretive acquisition pipeline*
> and a growing team of seasoned real estate professionals as we look towards a
> future internalization event.

115.    The First Quarter 2014 Press Release also stated:

> American Realty considers funds from operations ("FFO") and AFFO, which is
> FFO as adjusted to exclude acquisition-related fees and expenses, amortization of
> above-market lease assets and liabilities, amortization of deferred financing costs,
> straight-line rent, non-cash mark-to-market adjustments, amortization of restricted
> stock, non-cash compensation and gains and losses *useful indicators of the*
> *performance of a REIT*. Because FFO calculations exclude such factors as
> depreciation and amortization of real estate assets and gains or losses from sales of
> operating real estate assets (which can vary among owners of identical assets in
> similar conditions based on historical cost accounting and useful-life estimates),
> *they facilitate comparisons of operating performance between periods and between*
> *other REITs in our peer group.*
>
>                        *      *      *
>
> Additionally, the Company believes that AFFO, by excluding acquisition-related
> fees and expenses, amortization of above-market lease assets and liabilities,
> amortization of deferred financing costs, straight-line rent, non-cash mark-to-
> market adjustments, amortization of restricted stock, non-cash compensation and
> gains and losses, provides information consistent with management's analysis of
> the operating performance of the properties.  *By providing AFFO, ARCP believes*
> *it is presenting useful information that assists investors and analysts to better assess*
> *the sustainability of our operating performance.  Further, ARCP believes AFFO is*
> *useful in comparing the sustainability of our operating performance with the*
> *sustainability of the operating performance of other real estate companies,*
> *including exchange-traded and non-traded REITs.*
>
> *As a result, the Company believes that the use of FFO and AFFO, together with the*
> *required GAAP presentations, provide a more complete understanding of our*
> *performance relative to our peers and a more informed and appropriate basis on*
> *which to make decisions involving operating, financing, and investing activities.*

116.    Also on August 6, 2013, American Realty filed with the SEC its Form 10-Q for the quarter ended June 30, 2013 ("Second Quarter 2013 Form 10-Q").  The Second Quarter 2013 Form 10-Q was signed by Defendants Schorsch and Block, contained the same financial results and AFFO figures from the Second Quarter 2013 Press Release, and represented that those financial results were accurate and presented in accordance with GAAP.  The Second Quarter 2013 Form 10-Q also contained substantially similar statements about AFFO as other documents filed with the SEC by the Company during the Relevant Period.  *See* ¶115, above.

117.    In addition, the Company provided the following table that quantified "the items deducted or added to net loss in our calculation of FFO and AFFO for the three months ended June 30, 2013 and 2012 (amounts in thousands)" and assured investors that the listed amounts were "*presented net of any non-controlling interest effect where applicable*":

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2013 | 2012 | 2013 | 2012 |
| Net loss attributable to stockholders (in accordance with U.S. GAAP) | $ (51,679) | $ (7,070) | $ (189,613) | $ (12,098) |
| Merger and other transaction costs | 4,680 | 20 | 142,449 | 20 |
| Loss on contingent valuation rights | 31,134 | — | 31,134 | — |
| (Gain) loss on held for sale properties | — | 82 | (14) | 405 |
| Gain on sale of investment securities | — | — | (451) | — |
| Loss on derivative instruments | 40 | — | 45 | — |
| Interest on convertible obligation to preferred investors | 1,630 | — | 1,630 | — |
| Depreciation and amortization | 27,806 | 6,994 | 52,829 | 10,529 |
| FFO | 13,611 | 26 | 38,009 | (1,144) |
| | | | | |
| Acquisition and transaction related costs | 15,144 | 7,814 | 20,726 | 12,599 |
| Amortization of above-market lease | 63 | — | 126 | — |
| Amortization of deferred financing costs | 2,166 | 385 | 3,274 | 596 |
| Straight-line rent | (1,605) | (352) | (2,975) | (565) |
| Non-cash equity compensation expense | 3,454 | 178 | 4,330 | 324 |
| AFFO | $ 32,833 | $ 8,051 | $ 63,490 | $ 11,810 |

118.    Note 3 to the Second Quarter 2013 Form 10-Q, which was entitled "Summary of Significant Accounting Policies," represented that American Realty's financial statements "were prepared in conformity with U.S. GAAP" and that they included "all adjustments and accruals of a normal recurring nature, which, in the opinion of management, are necessary for a fair presentation of results for the interim periods."

119.    Under Item 4, Controls and Procedures, Disclosure Controls and Procedures, American Realty represented that Defendants Schorsch and Block had evaluated the effectiveness of American Realty's disclosure controls and procedures and determined that they were effective. Specifically, it stated that:

> In accordance with Rules 13a-15(b) and 15d-15(b) of the Securities Exchange Act, as amended (the "Exchange Act"), we, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, carried out an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q and determined that the disclosure controls and procedures are effective.
>
> No change occurred in our internal controls over financial reporting (as defined in Rule 13a-15(f) and 15d-15(f) of the Exchange Act) during the three months ended March 31, 2013 that has materially affected, or is reasonably likely to materially affect, our internal controls over financial reporting.

120.    After the market closed, Defendants held a conference call to discuss the Company's second quarter 2013 results.  During the call, Defendant Schorsch made the following statements about American Realty's results:

> Full quarter AFFO per share was $0.19.  More importantly, the normalized AFFO per share, which also represents the period end run-rate, was $0.23 per share *which was above our previously provided 2013 AFFO guidance.*
>
> \*       \*       \*
>
> To sum up, *we are extremely pleased with our accomplishments during this second quarter . . . Our current pipeline of acquisitions and balance sheet strength suggests that American Realty is well-positioned for continued earnings growth.*

As Brian will discuss in a moment . . . *we are updating our guidance to $1.14 to $1.18 per share on an AFFO basis.* This change to our earnings guidance results primarily from two factors – and this is very important. We will incur approximately $20 million in our guidance of additional debt service cost relating to terming out the fixed debt and increasing our acquisitions to $1.1 billion.

121.    Defendant Block also highlighted that American Realty revised upward its 2014

AFFO guidance "*based on increased acquisition activity* as well as a more deliberate pursuit of

fixed-rate, long-term, match-funded debt." Additionally, Defendant Block stated:

Our revised 2014 AFFO guidance is $1.14 to $1.18 per share, reflecting additional interest costs related to increased duration of fixed rate borrowings to match fund assets and liabilities ... and substantially higher acquisition volumes than previously projected. Specifically, we include about $1.4 billion of five, seven and ten year notes with a weighted average interest rate of approximately 4.1%.

### 2.    Cole Merger Announcement And Press Release

122.    On October 22, 2013, American Realty and Cole, Inc. entered into the Cole Merger

Agreement. Pursuant to the agreement, Cole, Inc. shareholders would receive either 1.0929 shares

of American Realty common stock or $13.82 in cash per Cole, Inc. share. On October 23, 2013,

American Realty and Cole, Inc. issued a press release entitled "American Realty Capital Properties

and Cole Real Estate Investments Merge to Create World's Largest Net Lease REIT with

Enterprise Value of $21.5 Billion" ("Cole Merger Press Release"). That same day, the Company

filed with the SEC a Form 8-K, which Defendant Schorsch signed, that included the press release

as an exhibit. The release announced that the transaction would benefit shareholders, would result

in "AFFO Growth" and increase American Realty "AFFO pro forma 2014 guidance of $1.13 to

$1.19 per share." The Company also filed various other merger-related documents with the SEC,

including copies of the Merger Agreement, the Voting Agreement and related Letter Agreements.

123.    In the Cole Merger Press Release, Defendant Schorsch commented that, as a result

of the merger:

American Realty will become the largest net lease REIT and the new industry leader . . . Both companies share the same vision, *namely to drive value for stockholders by placing their interests ahead of our own, aligning pay with performance, and reporting fully and transparently*. We share the same disciplined investment philosophy and investment processes, which are focused on investment grade tenancy, long lease durations, a strong diversified tenant base, and a mix of property type and geography.

*        *        *

As we enter 2014, we stand to become the largest listed net lease REIT.  With this acquisition, we continue to further diversify our asset and tenant base while *driving projected 2014 AFFO per share growth*.  This acquisition represents the continuation of our deliberate and focused growth strategy by improving profitability, mitigating risk through increased property type and tenant diversification, constructing a portfolio of properties that produce durable income and potential asset appreciation while preserving principal, providing some inflation and interest rate protection and *enabling us to deliver AFFO per share earnings accretion through further cost of capital advantages.  In addition, the merger with Cole furnishes the size and scale to allow us to continue to reduce our operating costs as a percentage of assets and potentially improve our AFFO multiple.*

124.    Later that day, American Realty held a conference call with analysts and investors

to discuss the merger.  During the conference call, executives from both companies continued to

tout the supposed benefits of the merger for shareholders.  Defendant Schorsch stated:

*This is an epic transaction.  Great companies combining in a win-win to the shareholders, the employees and the broker-dealer systems that we work with.  The portfolios just fit.  They fit very, very well.  We're a much stronger company.*

We have a – we have both proven ourselves.  And if you look back at the last six months, as we've gone through this transaction, we as a company have improved at American Realty – we've become investment-grade rated; we've managed our balance sheet and a number of other mergers to build a larger company of over $10 billion on a pro forma basis . . . today, we have created, with this merger, the largest net lease company on the globe.

*        *        *

Now let's talk about dividends.  The common dividend at closing will be increased $1.00 per share on the American Realty stock price.  American Realty shareholders are getting a 6.4% dividend increase.

125.    Additionally, the following exchange regarding the transaction took place between

analyst Mitch Germain of JMP Securities and Defendant Schorsch:

**Analyst Germain:** . . . I guess from that regard, the deal should be considered slightly dilutive. Is that the way to look at it here?

**Defendant Schorsch:** No, actually, no. If you look at Cole's acquisition pipeline, it was $500 million. If you look at our acquisition pipeline, it was $1 billion. So it's increased by $500 million. But we've also de-levered incredibly. So you've gone down by a full turn plus on debt to EBITDA without issuing equity to the public markets, without a discount, without a banking fee.

So on a leverage-neutral basis, it would obviously be highly accretive, but we don't want to be leverage-neutral. Neither us nor the Cole team want to be a company at nine times debt to EBITDA or 55% levered. So our goal is to be 6.5 times. And quite honestly, if you look at the fact that we're issuing cash, if that cash issuance goes down, we could actually be in the 6's coming out of the box, and garner significant upgrade from the agencies.

So, we believe that we're taking the excess value and driving a more -- a higher quality of earnings, Mitch. *So the answer to your question is, on a par basis, yes, it's leveraged -- it's effectively neutral or slightly dilutive. But we're also going from 9.1 times to 7.7 times, and that's a powerful statement.*
126.    Likewise, Defendant Block stated:

*Specific to adjusted funds from operations, or AFFO for 2014, our guidance remains unchanged with this transaction from a numbers' standpoint. We expanded the range slightly, due to the fact that we have variability here. In closing this merger within the first half of 2014, our guidance range on a fully diluted per-share basis is $1.13 to $1.19 per share.*

\*       \*       \*

Turning our attention specifically to 2014 guidance, I wanted to point out a range – from an FFO standpoint, fully diluted share count, as we talked about – $1.14 to $1.20; *AFFO, $1.13 to $1.19.* The key assumptions . . . include[] $11.2 billion purchase price for Cole. It assumes an election of 80% stock and 20% cash. We're assuming a $70 million expense reduction in aggregate from the combined organization. The distributions go up to $1.00 per share, and again, representing an 86% payout ratio.

127.    Additionally, the following exchange regarding American Realty's AFFO estimates

took place between analyst Dan Donlan of Ladenburg Thalmann and Defendant Block:

**Analyst Donlan:** Okay. And as far as when I look at the guidance, the range is wider now. What is – what's the delta between the two? I mean, is it you don't close on as many acquisitions and timing? Is it that your leverage would be higher at the high-end and lower at the low-end? What are the brackets . . . around the guidance range?

\*        \*        \*

**Defendant Block:** … Dan, in that number it also has to do with the cost of debt. If debt – if our debt cost comes down 15 or 20 bps, that we're going to be – we're going to push through the high end of the range very quickly. And if it's where we think it is, which is pretty conservative, we'll be middle, low-end of the range. I think that's probably the single biggest driver when you look at the variability. Because 5 basis points on acquisition cap rate, we can buy a lot more. The question is, do we want to? Because we don't want to lever up. And it also assumes our stock price, our combined stock price, being pretty conservative around 7% dividend yield.  And I'm not sure we're going to stay at a 7% dividend yield. So, those are – that's the other big variable, because if we're buying assets and we're issuing equity, and the equity cost changes to the upside, *it's going to increase our earnings dramatically.*

128.    The statements referenced above in ¶¶113-27 were each materially false and misleading and omitted material facts when made.  The true facts were that:

(a)    As the Company admitted in connection with its Restatement, American Realty's internal controls over financial reporting suffered from "material weaknesses," which resulted in the Company failing to  (i) maintain adequate controls to assess, authorize and monitor related-party transactions, validate the appropriateness of such transactions or manage the risks arising from contractual relationships with affiliates; (ii) maintain adequate controls over various grants of equity-based compensation; (iii) implement consistent policies and procedures relating to purchase accounting; (iv) establish clear reporting lines and job responsibilities or promote accountability over business process control activities; and (v) develop standardized policies and procedures for critical accounting estimates and non-routine transactions, including management review and approval of the accounting treatment of all critical and significant estimates;

(b)    American Realty's financial statements were materially false and misleading, did not accurately reflect the Company's financial performance, and were not prepared in conformity with GAAP.  In an effort to avoid public disclosure of American Realty's faltering financial performance, American Realty changed, among other things, its historical AFFO-

calculation methodology resulting in American Realty's reported AFFO, AFFO per share, net income and earnings per share being materially inflated and false;

(c)    American Realty was not, as it represented in its financial statements, applying the "net" method of calculating AFFO.  Rather, the Company was intentionally and improperly adding back costs that were not associated with its ownership interest in the Operating Partnership;

(d)    American Realty's 2014 AFFO estimates and related statements about its projected earnings growth were not accurate, attainable, honestly believed, or founded on a reasonable basis.  As Defendants knew but omitted to disclose to investors, American Realty's claimed AFFO growth could only be achieved through Defendants' continued falsification of American Realty's financial statements;

(e)    The Cole Merger would not drive 2014 AFFO per share growth or earnings accretion, but rather would allow American Realty to conceal its inability to meet its 2013 and 2014 performance estimates;

(f)    As the Company admitted in connection with its Restatement, American Realty's disclosure controls and procedures suffered from "material weaknesses" and were not properly designed or implemented to ensure that (i) AFFO per share was correctly calculated; (ii) AFFO guidance, and the Company's ability to meet that guidance, were accurate; (iii) the information in its SEC filings correctly reflected its internal accounting records; and (iv) its SEC filings were reviewed on a timely basis by senior management and that significant changes in previously reviewed documents were brought to the attention of the Audit Committee for approval before filing;

(g)    The Company's rapid pace of mergers and acquisitions during the Relevant Period "had a severe impact on the Company's control environment" and exacerbated the deficiencies in American Realty's internal controls and financial reporting processes;

(h)    American Realty's "growth by acquisition" strategy was not beneficial for American Realty shareholders, but instead, by design, generated transaction fees for Schorsch-controlled companies and resulted in large compensation payments to executives in Schorsch-controlled companies without regard to the underlying fairness of the transaction.

### 3.    Third Quarter 2013 Financial Results

129.    On November 7, 2013, American Realty issued a press release entitled "American Realty Capital Properties Announces Third Quarter 2013 Operating Results and $0.21 AFFO per Share" ("Third Quarter 2013 Press Release").  That same day, the Company filed with the SEC a Form 8-K, which Defendant Schorsch signed, that included the press release as an exhibit.  The release announced AFFO of $46.7 million, or $0.21 per share, and confirmed "[u]pdated AFFO pro forma 2014 guidance of $1.13 to $1.19 per share."

130.    The Third Quarter 2013 Press Release contained the following comments from Defendant Schorsch regarding the Company's financial results:

> We have continued to build enterprise value during this third quarter, and for now are intently focused on execution . . . .  In this regard, we have identified several near-term key objectives: completing the announced ARCT IV and Cole transactions; becoming self-managed and significantly broadening our intellectual capital by continuing to attract the best and brightest managers in the industry; deleveraging and terming out our balance sheet utilizing long-term, fixed rate debt; and effectively and seamlessly integrating Cole organization.
>
> *        *        *
>
> ***We are fully committed to becoming self-managed, as promised*** . . . .  In fact, it is a closing condition for our merger with Cole.  We will announce the President of American Realty before year-end. We have already moved to bolster our team with several key hires.  Brian Block, our CFO, will now be focused exclusively on American Realty.  Lisa Beeson joins us as COO after 25 years as an investment banker with tremendous M&A and capital markets expertise.  Lisa Pavelka

McAlister is our new CAO with 25 years' experience in senior financial roles versed in all aspects of financial and accounting operations.

<div align="center">*     *     *</div>

Defendant Block:

***Our 3rd quarter operating results are in-line with projections*** . . . We are well positioned to close our pending acquisitions and execute our capital plan.

131.    The Third Quarter 2013 Press Release also contained language similar to that included in other press releases during the Relevant Period with respect to the importance of AFFO. *See* ¶115, above.

132.    Also on November 7, 2013, American Realty filed with the SEC its Form 10-Q for the quarter ended September 30, 2013 ("Third Quarter 2013 Form 10-Q"). The Third Quarter 2013 Form 10-Q was signed by Defendants Schorsch and Block, contained the same financial results and AFFO figures from the Third Quarter 2013 Press Release, and represented that those financial results were accurate and presented in accordance with GAAP. The Third Quarter 2013 Form 10-Q also contained substantially similar statements about AFFO as compared to the other documents filed by the Company with the SEC during the Relevant Period. *See* ¶¶109, 116, above.

133.    In addition, the Company provided the following table that quantified "the items deducted or added to net loss in our calculation of FFO and AFFO for the three months ended September 30, 2013 and 2012 (amounts in thousands)," and assured investors that the listed amounts were "***presented net of any non-controlling interest effect where applicable***":

| | | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|---|
| | | 2013 | 2012 | 2013 | 2012 |
| Net loss attributable to stockholders (in accordance with U.S. GAAP) | $ | (59,063) $ | (12,690) $ | (248,676) $ | (24,788) |
| (Gain) loss on held for sale properties | | – | 47 | (14) | 452 |
| Depreciation and amortization | | 39,382 | 11,632 | 92,211 | 22,161 |
|   FFO | | (19,681) | (1,011) | (156,479) | (2,175) |
| | | | | | |
| Acquisition related | | 1,235 | 14,636 | 21,961 | 27,235 |
| Merger and other transaction costs | | 3,791 | – | 146,240 | 20 |
| Loss on contingent valuation rights | | 38,542 | – | 69,676 | – |
| Gain on sale of investment securities | | – | – | (451) | – |
| Loss on derivative instruments | | 99 | – | 144 | – |
| Interest on convertible obligation to preferred investors | | 7,266 | – | 8,896 | – |
| Interest on convertible debt | | 1,554 | – | 1,554 | – |
| Interest premium on settlement of convertible obligation to preferred investors and convertible debt | | 5,174 | – | 5,174 | – |
| Amortization of above-market lease | | 63 | – | 189 | 56 |
| Amortization of deferred financing costs | | 3,505 | 385 | 6,914 | 1,226 |
| Straight-line rent | | (2,063) | (581) | (5,038) | (1,147) |
| Non-cash equity compensation expense | | 7,180 | 480 | 11,510 | 804 |
|   AFFO | $ | 46,665 $ | 13,909 $ | 110,290 $ | 26,019 |

134.   Note 3 to the Third Quarter 2013 Form 10-Q, which was entitled "Summary of Significant Accounting Policies," represented that American Realty's financial statements "were prepared in conformity with U.S. GAAP" and that they included "all adjustments and accruals of a normal recurring nature, which, in the opinion of management, are necessary for a fair presentation of results for the interim periods."

135.   The Third Quarter 2013 Form 10-Q also contained the same internal disclosure controls Certifications and SOX Certifications that were included with American Realty's other Forms 10-Q filed during the Relevant Period.  *See* ¶¶119, above.  Again, Defendants Schorsch and Block signed the Certifications.

136.    After the market closed, Defendants held a conference call to discuss the

Company's third quarter 2013 results.  During the November 7, 2013 conference call, Defendant

Schorsch made the following statement about American Realty's financial results and outlook:

> We continue to see attractive organic acquisition opportunities, with no shortage of
> available product in the market, high-quality property, strong tenants, long leases,
> and accretive pricing.  ***Our 2014 AFFO earnings guidance, which reflects the
> acquisition of Cole, assumes a closing date of April 1 and is $1.13 to $1.19 per
> share.  This range includes only $2 billion of acquisitions for 2014, which we
> think is very manageable,*** particularly given the historic acquisition activity of our
> combined organizations.

137.    Defendant Block also made the following statement related to the Cole Merger:

> In connection with the Cole merger, we widened our 2013 guidance by $0.01 on
> each side of the range based on the uncertainty with respect to the anticipated closing
> date. . . .
>
> ***Our 2014 AFFO guidance is $1.13 to $1.19 per share.***  This range, which assumes
> the Cole merger to close the end of the first quarter of 2014, reflects additional
> interest costs attributable to increased duration of fixed rate borrowings to match
> fund, assets and liabilities, as I previously noted, and higher acquisition volumes
> than previously projected, reflecting increased capacity of the combined teams.

### 4.    Cole Merger Presentation

138.    On November 12, 2013, Defendants issued a shareholder presentation regarding

the Cole Merger, which reiterated that the merger would create the world's largest net lease REIT

and would generate "significant operating efficiencies" and "AFFO growth" for American Realty.

The presentation also reiterated that "2014 AFFO growth estimates" were being "updated to $1.13

to $1.19 per share (fully diluted)" and indicated that, even without additional acquisitions,

American Realty's AFFO for 2014 would be "$1.13 per share."

### 5.    ARCT IV Merger Proxy Materials

139.    On December 3, 2013, Defendants filed a Registration Statement with the SEC

related to the ARCT IV merger, and disseminated a Joint Proxy Statement/Prospectus ("ARCT IV

Registration Statement/Proxy") to shareholders.

140.    The ARCT IV Registration Statement/Proxy represented that the ARCT IV Board had unanimously determined that the merger was "advisable, fair to, and in the best interests of ARCT IV and its stockholders."   Accordingly, the American Realty Board recommended that American Realty shareholders approve the transaction.    The ARCT IV Registration Statement/Proxy extolled the virtues of the proposed transaction, including that the merger would "provide ARCP with significant future acquisitions capacity and higher future AFFO growth rate, and the combined company's stockholders will benefit from a stable and secure dividend, which is expected to increase to $0.94 per share following the merger."   The ARCT IV Registration Statement/Proxy contained a section entitled "Certain Prospective Financial Information Reviewed by ARCT IV," which contained the following AFFO projections:

| ($ in millions) | 2011 | 2012 | 2013 (6 months) | 2014 | 2015 | 2016 | 2017 | 2018 |
|---|---|---|---|---|---|---|---|---|
| EBITDA as adjusted | ($2) | $ 15 | $ 23 | $ 525 | $ 604 | $ 681 | $ 757 | $ 831 |
| Funds from Operations as adjusted (FFO as adjusted) | ($2) | $ 4 | $ 38 | $ 379 | $ 443 | $ 505 | $ 565 | $ 623 |
| Adjusted Funds from Operations (AFFO) | $ 2 | $ 48 | $ 63 | $ 380 | $ 445 | $ 505 | $ 564 | $ 620 |

141.    Additionally, the ARCT IV Registration Statement/Proxy incorporated by reference the following American Realty financials, many of which have now been restated: 2012 Form 10-K, First Quarter 2013 Form 10-Q, Second Quarter 2013 Form 10-Q and Third Quarter 2013 Form 10-Q.   Defendants Schorsch and Block signed each of the incorporated financial statements, which assured investors that:

> [W]e, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, carried out an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q and determined that the disclosure controls and procedures are effective.

142.    The ARCT IV merger agreement ("ARCT IV Merger Agreement") was attached as Annex A to the ARCT IV Registration Statement/Proxy.  Section 5.7(a) of the ARCT IV Merger Agreement represented that American Realty's SEC filings "complied in all material respects with the requirements of the Securities Act or the Exchange Act, as the case may be, and the applicable rules and regulations of the SEC thereunder," and did not contain "any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading."

143.    Section 5.7(c) of the ARCT IV Merger Agreement also represented that:

- American Realty and its subsidiaries "maintain a system of internal accounting controls sufficient to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP . . . ."

- the members of the American Realty's audit committee had been informed of "all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial data."

144.    Section 5.7(c) of the ARCT IV Merger Agreement further represented that:

[American Realty] ha[d] established and maintains disclosure controls and procedures (as such term is defined in Rule 13a-15 promulgated under the Exchange Act) designed to ensure that material information relating to [American Realty] required to be included in reports filed under the Exchange Act, including its consolidated subsidiaries, is made known to [American Realty's] principal executive officer and its principal financial officer by others within those entities, particularly during the periods in which the periodic reports required under the Exchange Act are being prepared, and, to the knowledge of [American Realty], such disclosure controls and procedures are effective in timely alerting [American Realty's] principal executive officer and its principal financial officer to material information required to be included in [American Realty's] periodic reports required under the Exchange Act.

145.    Section 5.8(a) of the ARCT IV Merger Agreement further represented that:

None of the information supplied or to be supplied in writing by or on behalf of [American Realty] for inclusion or incorporation by reference in (i) the Form S-4 [Registration Statement] will, at the time such document is filed with the SEC, at any time such document is amended or supplemented or at the time such document is declared effective by the SEC, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein not misleading, or (ii) the Joint Proxy Statement will, at the date it is first mailed to the stockholders of [ARCT IV and American Realty], at the time of the [ARCT IV] Stockholder Meeting and the [American Realty] Stockholder Meeting, at the time the Form S-4 is declared effective by the SEC or at the Effective Time, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading.

146.    On December 3, 2013, the ARCT IV Registration Statement/Proxy was disseminated to shareholders.  The version sent to shareholders contained American Realty's fiscal year 2012 financial data and financial data for the period ended September 30, 2013, and represented that "[i]n ARCP's opinion, such unaudited financial statements include all adjustments (consisting of normal recurring adjustments) necessary for a fair presentation of the interim September 30, 2013 financial information."

### 6.    December 2013 Debt Offerings

147.    On December 4, 2013, American Realty announced:

a)    a reopening of the 2018 Notes, which were ultimately priced at $287.5 million (the "December 2013 Reopening").  The December 2013 Reopening was conducted pursuant to the 2013 Shelf Registration Statement, a Pricing Term Sheet and Free Writing Prospectuses dated December 5, 2013, and Prospectus Supplements dated December 5, 6, and 9, 2013 (collectively, the "December 2013 Reopening Materials"); and

b)    an offering of 3.75% Convertible Senior Notes due December 15, 2020, which were ultimately priced at $402.5 million (the "2020 Notes") (the "December 2013 Note Offering").  The December 2013 Note Offering was conducted pursuant to the 2013 Shelf Registration Statement, a Pricing Term Sheet dated December 5, 2013, and Prospectus

69

Supplements dated December 5, 6 and 9, 2013 (collectively, the "December 2013 Offering Materials").

148.    The December 2013 Reopening Materials and the December 2013 Offering Materials incorporated by reference American Realty's 2012 Form 10-K, First Quarter 2013 Form-10-Q, Second Quarter 2013 Form 10-Q, and Third Quarter 2013 Form 10-Q. These materials contained untrue statements of material fact and omitted to state material facts required therein or necessary to make the statements therein not misleading, as described above in ¶¶108-10.

### 7.    Cole Merger Proxy Materials

149.    On December 20, 2013, American Realty and Cole, Inc. filed the Cole Registration Statement with the SEC. On December 23, 2013, the Company filed the Cole Merger Proxy with the SEC. A copy of the Cole Merger Agreement was attached to both the Cole Registration Statement and the Cole Merger Proxy and was incorporated by reference in both documents.

150.    The Cole Registration Statement/Merger Proxy represented that the Cole, Inc. Board had unanimously determined that the merger was "advisable, fair to and in the best interests of ARCP and its stockholders." Likewise, the American Realty Board unanimously recommended that the transaction be approved.

151.    American Realty's First Quarter 2013 Form 10-Q, Second Quarter 2013 Form 10-Q and Third Quarter 2013 Form 10-Q, which were each signed by Defendants Schorsch and Block and incorporated into the Cole Registration Statement and Cole Merger Proxy, also assured investors that:

> [W]e, under the supervision and with the participation of our Chief Executive Officer and Chief Financial Officer, carried out an evaluation of the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Quarterly

Report on Form 10-Q and determined that the disclosure controls and procedures are effective.

152. The Cole Registration Statement/Merger Proxy, which was disseminated on December 23, 2013 to American Realty and Cole, Inc. shareholders, presented financial data for American Realty for the first nine months of 2013, ending September 30, 2013, and represented that "[i]n [American Realty's] opinion, such unaudited financial statements include all adjustments (consisting of normal recurring adjustments) necessary for a fair presentation of the interim September 30, 2013 financial information."

153. In addition, the Company provided the following table that quantified "items deducted or added to net loss in our calculation of FFO and AFFO for the three and nine months ended September 30, 2013 and 2012" and assured investors that the amounts listed were "*presented net of any non-controlling interest effect where applicable* (in thousands)":

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2013 | 2012 | 2013 | 2012 |
| Net loss attributable to stockholders (in accordance with U.S. GAAP) | $ (59,063) | $ (12,690) | $(248,676) | $ (24,788) |
| (Gain) loss on held for sale properties | — | 47 | (14) | 452 |
| Depreciation and amortization | 39,382 | 11,632 | 92,211 | 22,161 |
| FFO | (19,681) | (1,011) | (156,479) | (2,175) |
| Acquisition related | 1,235 | 14,636 | 21,961 | 27,235 |
| Merger and other transaction costs | 3,791 | — | 146,240 | 20 |
| Loss on contingent valuation rights | 38,542 | — | 69,676 | — |
| Gain on sale of investment securities | — | — | (451) | — |
| Loss on derivative instruments | 99 | — | 144 | — |
| Interest on convertible obligation to preferred investors | 7,266 | — | 8,896 | — |
| Interest on convertible debt | 1,554 | — | 1,554 | — |
| Interest premium on settlement of convertible obligation to preferred investors and convertible debt | 5,174 | — | 5,174 | — |
| Amortization of above-market lease | 63 | — | 189 | 56 |
| Amortization of deferred financing costs | 3,505 | 385 | 6,914 | 1,226 |
| Straight-line rent | (2,063) | (581) | (5,038) | (1,147) |
| Non-cash equity compensation expense | 7,180 | 480 | 11,510 | 804 |
| AFFO | $ 46,665 | $ 13,909 | $ 110,290 | $ 26,019 |

71

154.    Additionally, the Cole Merger Proxy materials contained substantially similar representations as the American Realty SEC filings and press releases regarding the importance of AFFO, including that it was a "useful" indicator of performance and facilitated comparisons between American Realty and other REITs.  *See, e.g.,* ¶¶107, above.

155.    The Cole Merger Agreement represented that American Realty's SEC filings and the financial data within those filings were free of material misstatements and omissions.  For example, Section 5.7(a) of the Cole Merger Agreement represented that "[e]ach [American Realty] SEC Filing . . . *did not, at the time it was filed, contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading.*"

156.    Section 5.7(c) of the Cole Merger Agreement represented that American Realty and its subsidiaries *"have devised and maintain a system of internal accounting controls sufficient to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP*[.]"

157.    Section 5.7(c) of the Cole Merger Agreement further represented that American Realty's "principal executive officer and its principal financial officer" had disclosed to American Realty's auditor and the audit committee "(i) *all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting that are reasonably likely to adversely affect [American Realty's] ability to record, process, summarize and report financial data*, and (ii) *any fraud, whether or not material, that involves management or other employees who have a significant role in [American Realty's] internal control*s[.]"

158.    Additionally, as with American Realty's periodic financial statement filings during

the Relevant Period, Section 5.7(c) of the Cole Merger Agreement represented that:

> [American Realty] ha[d] established and maintains disclosure controls and
> procedures (as such term is defined in Rule 13a-15 promulgated under the
> Exchange Act) designed to ensure that material information relating to [American
> Realty] required to be included in reports filed under the Exchange Act, including
> its consolidated subsidiaries, is made known to [American Realty's] principal
> executive officer and its principal financial officer by others within those entities,
> particularly during the periods in which the periodic reports required under the
> Exchange Act are being prepared, and, to the knowledge of [American Realty],
> such disclosure controls and procedures are effective in timely alerting [American
> Realty's] principal executive officer and its principal financial officer to material
> information required to be included in [American Realty's] periodic reports
> required under the Exchange Act.

159.    Section 5.8(a) of the Cole Merger Agreement represented that the information

provided to investors in connection with the merger was free from untrue statements and

omissions:

> None of the information supplied or to be supplied in writing on behalf of
> [American Realty] for inclusion or incorporation by reference in (i) the [Cole
> Registration Statement] will, at the time such document is filed with the SEC, at
> any time such document is amended or supplemented or at the time such document
> is declared effective by the SEC, *contain any untrue statement of a material fact
> or omit to state any material fact required to be stated therein or necessary to
> make the statements therein not misleading*, or (ii) the Joint Proxy Statement will,
> at the date it is first mailed to the stockholders of [Cole, Inc. and of American
> Realty], at the time of the [Cole, Inc.] Stockholder Meeting and the American
> Realty[] Stockholder Meeting, at the time the Form S-4 is declared effective by the
> SEC or at the Effective Time, *contain any untrue statement of a material fact or
> omit to state any material fact required to be stated therein or necessary to make
> the statements therein, in light of the circumstances in which they were made,
> not misleading.*

160.    Section 6.2(c)(v) of the Cole Merger Agreement represented that American Realty

would "maintain all financial books and records in all material respects in accordance with GAAP."

### 8.    ARCT IV Merger Closing

161.    On January 3, 2014, American Realty issued a press release that announced the

completion of the ARCT IV Merger.  Specifically, under the terms of the merger, American Realty

issued the following consideration to ARCT IV stockholders for each ARCT IV share: (1) $9.00 in cash; (2) 0.5190 of a share of American Realty common stock (valued at $6.68 using the American Realty closing price of $12.87 on January 2, 2014, the trading day prior to the closing of the merger and representing 21.9% of the total nominal consideration); and (3) 0.5937 shares of American Realty's 6.70% Series F Cumulative Redeemable Preferred Stock. American Realty issued 36.9 million shares of common stock and 42.2 million shares of Series F Preferred Stock to former ARCT IV stockholders at the closing of the merger.

162.    In the press release, Defendant Block remarked that the ARCT IV Merger was "instrumental to achieving 2014 AFFO growth per share, and will reduce our balance sheet leverage with ARCT IV's highly unencumbered portfolio of real estate assets." Defendant Block also stated that American Realty's 2014 AFFO guidance range was "from $1.13 per share to $1.19 [per share]."

### 9.    Cole Merger Closing

163.    On February 7, 2014, following approval by Cole, Inc. and American Realty shareholders, the Cole Merger closed. The $11.2 billion merger allowed for shares of Cole, Inc. common stock to be exchanged for shares of American Realty common stock and/or cash pursuant to the terms of the Cole Merger Agreement, as set forth in the Cole Registration Statement/Proxy. 98% of Cole shareholders received 1.0929 shares of American Realty common stock for each Cole share.

164.    That same day, American Realty issued a press release commenting on the closing of the Cole Merger entitled "American Realty Capital Properties Completes Acquisition of Cole Real Estate Investments Creating Largest Net Lease REIT" ("February 7, 2014 Press Release"). American Realty also filed with the SEC a Form 8-K, which Defendant Schorsch signed, that

included the February 7, 2014 Press Release as an exhibit.  In the February 7, 2014 Press Release,

Defendants extolled the virtues of the Cole Merger.  For example, Defendant Schorsch stated:

> With the closing of the Cole acquisition, *we have become one of the leading publicly traded REITs, and the dominant net lease REIT, 61% larger than the closest net lease competitor.* With the scale and advantages that come with being a $21.5 billion investment grade credit rated company, we expect to enjoy a significant cost of capital advantage. We intend to use this low cost, readily available capital to build out our portfolio and to attract and retain exceptional professionals.

165.    Defendant Kay added that:

> Following closing, the combination of our previously separate management teams provides us a powerful leadership core to firmly establish a solid foundation for the future. *With Cole in the fold, we will now focus further on de-levering our balance sheet, broadening our unencumbered asset pool and fine-tuning our duration matching, all this to further enhance the durability of our cash flows.*

166.    Defendant Beeson remarked that American Realty had grown "rapidly yet

deliberately" and that through the Cole Merger, American Realty expected "to benefit from

significant synergies, totaling approximately $70 million."  Defendant Block further stated that the

Company reaffirmed its "2014 AFFO guidance range of $1.13 to $1.19 per share."

167.    The February 7, 2014 Press Release also highlighted several additional supposed

"benefits" of the Cole Merger, including (1) Enhanced Scale and Competitiveness; (2) Increased

Institutional Coverage and Ownership/Investment Grade Credit Rating; (3) Operational

Efficiencies and Expense Reductions; and (4) Cost of Capital Advantage.  The release further

highlighted that – in addition to Moody's – American Realty had now received an "investment

grade credit rating from Standard & Poor's Rating Services."

168.    The statements referenced above in ¶¶149-67, were each materially false and

misleading and omitted material facts when made.  The true facts were that:

(a)    As the Company admitted in connection with its Restatement, American

Realty's internal controls over financial reporting suffered from "material weaknesses," which

resulted in the Company failing to (i) maintain adequate controls to assess, authorize and monitor related-party transactions, validate the appropriateness of such transactions or manage the risks arising from contractual relationships with affiliates; (ii) maintain adequate controls over various grants of equity-based compensation; (iii) implement consistent policies and procedures relating to purchase accounting; (iv) establish clear reporting lines and job responsibilities or promote accountability over business process control activities; and (v) develop standardized policies and procedures for critical accounting estimates and non-routine transactions, including management review and approval of the accounting treatment of all critical and significant estimates;

(b)      American Realty's financial statements were materially false and misleading, did not accurately reflect the Company's financial performance, and were not prepared in conformity with GAAP.  In an effort to avoid public disclosure of American Realty's faltering financial performance, American Realty changed, among other things, its historical AFFO-calculation methodology resulting in American Realty's reported AFFO, AFFO per share, net income and earnings per share being materially inflated and false;

(c)      American Realty was not, as it represented in its financial statements, applying the "net" method of calculating AFFO.  Rather, the Company was intentionally and improperly adding back costs that were not associated with its ownership interest in the Operating Partnership;

(d)      American Realty's 2014 AFFO estimates and related statements about its projected earnings growth were not accurate, attainable, honestly believed, or founded on a reasonable basis.  As Defendants knew but omitted to disclose to investors, American Realty's claimed AFFO growth could only be achieved through Defendants' continued falsification of American Realty's financial statements;

(e)    The Cole Merger and the ARCT IV Merger would not drive 2014 AFFO per share growth or earnings accretion, but rather would allow American Realty to conceal its inability to meet its 2013 and 2014 performance estimates;

(f)    As the Company admitted in connection with its Restatement, American Realty's disclosure controls and procedures suffered from "material weaknesses" and were not properly designed or implemented to ensure that (i) AFFO per share was correctly calculated; (ii) AFFO guidance, and the Company's ability to meet that guidance, were accurate; (iii) the information in its SEC filings correctly reflected its internal accounting records; and (iv) its SEC filings were reviewed on a timely basis by senior management and that significant changes in previously reviewed documents were brought to the attention of the Audit Committee for approval before filing;

(g)    The Company's rapid pace of mergers and acquisitions during the Relevant Period "had a severe impact on the Company's control environment" and exacerbated the deficiencies in American Realty's internal controls and financial reporting processes;

(h)    American Realty's "growth by acquisition" strategy was not beneficial for its shareholders, but instead was designed to generate transaction fees for Schorsch-controlled companies and to result in large compensation payments to executives in Schorsch-controlled companies without regard to the underlying fairness of the transaction.  In particular, the Cole Merger was not a "terrific result[]" for American Realty shareholders, but rather was designed to and did permit the payment of $37 million in related-party transactional fees and compensation payments to American Realty insiders and other parties affiliated with Schorsch; and

77

(i)    The ARCT IV Merger and the Cole Merger were not "advisable, fair to and in the best interests of ARCP and its stockholders."[5]

### 10.    Fourth Quarter And Year-End 2013 Financial Results

169.    On February 27, 2014, American Realty issued a press release announcing "Record Earnings of $163.9 Million and AFFO Per Share of $0.86 for 2013" ("Fourth Quarter 2013 Press Release"). That same day, the Company filed with the SEC a Form 8-K, which Defendant Schorsch signed, that included the press release as an exhibit. The release touted, among other things, record earnings and AFFO. Specifically, American Realty announced AFFO of $55.8 million, a year-over-year increase of 153%, and AFFO per fully diluted share of $0.25, a year-over-year increase of 108%. For the fiscal year ended 2013, the Company reported AFFO of $163.9 million, an increase of 240% from 2012, and AFFO per fully diluted share of $0.86, an increase of over 80% from 2012 and "Exceeding Consensus AFFO Estimates." The Company also reiterated its full-year 2014 AFFO per share estimates of $1.13 to $1.19 per fully diluted share.

170.    In the Fourth Quarter 2013 Press Release, Defendant Schorsch commented that:

> As these results unequivocally demonstrate, ***we have accomplished an extraordinary amount in a very short time, underscoring our ability to execute key initiatives on every level across the organization.*** We will complete over $1.0 billion of acquisitions during the first quarter, at a pace ahead of projections and accretive to our earnings. ***Our robust pipeline of property acquisitions, as well as other corporate opportunities we are privy to, is consistent with our ability to grow impressively, while staying true to our strategy***.

<p align="center">*     *     *</p>

---

[5] In addition to the materially false and misleading statements and omissions specifically identified in Section VI above, Defendants made the same or substantially similar misstatements in other American Realty SEC filings and public documents. These additional misstatements, which were materially false and misleading when made for the same reasons identified in Section VI above, were contained or incorporated in at least the following documents: (1) the registration statement and prospectus for the Company's September 7, 2011 IPO; (2) the registration statement, joint proxy statement/prospectus, and Forms 8-K for the Company's February 28, 2013 ARCT III merger; and (3) the shelf registration statement, prospectus supplements, and Forms 8-K for the Company's January 29, 2013 common stock offering.

In addition to the strong growth we have seen with our earnings, American Realty's improved leverage posture and identified G&A synergies from the Cole acquisition are also generating a positive impact to the bottom line. ***Not only did we beat consensus estimates for the fourth quarter, our first quarter is off to a tremendous start. When you compare these financial results to our peer group valuation metrics, particularly dividend yield and earnings multiple, we believe our Company is undervalued and poised for a share price increase.***

171.    The Fourth Quarter 2013 Press Release also contained a statement from Defendant

Block, who extolled American Realty's annual results:

2013 proved to be ***a record-setting year*** for American Realty both in terms of earnings and growth, allowing us to beat consensus estimates. ***Based on the strength of our self-originated acquisitions . . . we firmly believe that 2014 will be an even more impressive year. These factors should fortify our 2014 AFFO guidance of $1.13 to $1.19 per share . . . With strong AFFO per share growth, an attractive property portfolio, strong credit tenants bounded by long-term net leases and an attractively positioned balance sheet, we believe American Realty has the catalysts to provide long-term shareholder returns.***

172.    The Fourth Quarter 2013 Press Release also contained the following statement

about AFFO and the Company's AFFO estimates:

**Funds from Operations and Adjusted Funds from Operations**

Funds from operations ("FFO") for the three months ended December 31, 2013, totaled $(93.2) million, or $(0.43) per share. FFO for this period includes one-time merger and other transaction related expenses of $111.7 million. FFO for the 12 months ended December 31, 2013 totaled $(249.5) million, or $(1.43) per fully diluted share. FFO for this period includes one-time merger and other transaction related expenses of $280.0 million. Excluding such one-time costs, FFO was $30.4 million, or $0.16 per share fully diluted. ***Adjusted funds from operations ("AFFO") for the three months ended December 31, 2013, totaled $55.8 million, or $0.25 per fully diluted share. AFFO for the 12 months ended December 31, 2013 totaled $163.9 million, or $0.86 per share fully diluted.***

\*       \*       \*

**2014 Guidance**

In connection with the announcement of the Merger transaction, American Realty reiterated ***2014 AFFO guidance from $1.13 to $1.19 per share***.

173.    The Fourth Quarter 2013 Press Release also contained language similar to that included in other press releases during the Relevant Period with respect to the importance of AFFO.  *See* ¶¶115, above.

174.    Also on February 27, 2014, American Realty filed with the SEC its annual report on Form 10-K for the year ended December 31, 2013 ("2013 Form 10-K").  The 2013 Form 10-K, which was signed by, among others, Defendants Schorsch, Block, Kay, and McAlister, contained the same financial results and AFFO figures from the Fourth Quarter 2013 Press Release, and represented that those financial results were accurate and presented in accordance with GAAP.

175.    The 2013 Form 10-K also contained substantially similar statements about AFFO as compared to the Company's other public representations during the Relevant Period. Specifically:

> In this report, American Realty again discussed the importance of AFFO with regards to Company performance, stating: ***We consider FFO and AFFO useful indicators of the performance of a REIT***.  Because FFO calculations exclude such factors as depreciation and amortization of real estate assets and gains or losses from sales of operating real estate assets (which can vary among owners of identical assets in similar conditions based on historical cost accounting and useful life estimates), they facilitate comparisons of operating performance between periods and between other REITs in our peer group.  Accounting for real estate assets in accordance with U.S. GAAP implicitly assumes that the value of real estate assets diminishes predictably over time.  Since real estate values have historically risen or fallen with market conditions, many industry investors and analysts have considered the presentation of operating results for real estate companies that use historical cost accounting to be insufficient by themselves.

176.    In addition, the Company provided the following table that quantified "items deducted or added to net loss in our calculation of FFO and AFFO for the years ended December 31, 2013, 2012 and 2011 and on a pro forma basis for the year ended December 31, 2013 (amounts in thousands)" and assured investors that the amounts listed were "***presented net of any non-controlling interest effect, where applicable***":

| | Year Ended December 31, | | | ARCP Pro Forma |
|---|---|---|---|---|
| | 2013 | 2012 | 2011 | |
| Net loss attributable to stockholders | $ (406,505) | $ (39,399) | $ (4,699) | $ 228,632 |
| (Gain) loss on held for sale properties | (14) | 600 | 815 | (55,041) |
| Depreciation and amortization | 156,971 | 40,700 | 2,111 | 604,479 |
| FFO | (249,548) | 1,901 | (1,773) | 778,070 |
| Acquisition related | 23,295 | 42,761 | 3,898 | — |
| Merger and other transaction related | 256,682 | 2,603 | — | — |
| (Gain) loss on investment securities | (40) | (534) | — | 3,537 |
| Loss on derivative instruments, net | 67,937 | — | 2 | 69,111 |
| Interest on convertible obligation to preferred investors | 10,802 | — | — | — |
| Interest premiums and discounts on debt, net and settlement of convertible obligation to preferred investors | 12,072 | — | — | 11,843 |
| Amortization of above- and below-market lease assets and liabilities | (246) | 108 | — | 2,744 |
| Amortization of deferred financing costs | 11,185 | 1,985 | 186 | 16,473 |
| Straight-line rent | (8,791) | (2,145) | (239) | (83,947) |
| Non-cash equity compensation expense | 34,935 | 1,191 | 191 | 34,935 |
| Operating fees to affiliate | 5,654 | 212 | — | $ 63,002 |
| AFFO | $ 163,915 | $ 48,082 | $ 2,275 | $ 913,768 |

177.    Specifically, the table represented that AFFO was $163,915,000 for the year ended December 31, 2013, compared to $48,082,000 for the year ended December 31, 2012.

178.    Note 3 to the 2013 Form 10-K, which was entitled "Summary of Significant Accounting Policies," represented that American Realty's financial statements were "prepared on the accrual basis of accounting in accordance with U.S. GAAP."

179.    Defendants also stated the following with respect to the Company's internal controls and procedures:

> In accordance with Rules 13a-15(b) and 15d-15(b) of the Exchange Act, management, with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K. Based on such evaluation, our Chief Executive Officer and Chief Financial Officer have concluded, as of the end of such period, that our disclosure controls and procedures are effective in recording, processing, summarizing and reporting, on a timely basis, information required to be disclosed by us in our reports that we file or submit under the Exchange Act.

**Management's Annual Report on Internal Control over Financial Reporting**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under

the Securities Exchange Act of 1934, as amended. Our internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with generally accepted accounting principles.

<p align="center">*        *        *</p>

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2013. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in the 1992 Internal Control-Integrated Framework.

**Based on our assessment, our management believes that, as of December 31, 2013, our internal control over financial reporting is effective.**

180.    The 2013 Form 10-K also contained the same internal disclosure control Certifications and SOX Certifications that were included with American Realty's Forms 10-Q filed during the Relevant Period. *See* ¶¶119, above. Again, Defendants Schorsch and Block signed the Certifications which provided, among other things, that Defendants Schorsch and Block had reviewed the 2013 Form 10-K and that it contained no materially untrue statements or omissions; fairly represented in all material respects the financial condition of American Realty; was accurate in all material respects; and disclosed any material changes to the Company's internal control over financial reporting.

181.    After the market closed on February 27, 2014, Defendants held a conference call to discuss the Company's fourth quarter 2013 results. During the conference call, Schorsch confirmed that **"[o]ur earnings guidance is solid,"** and even had **"room for upside[.]"** Defendant Block stated:

We are very pleased to be sharing such impressive results for 2013 and the beginning of 2014. . . . **Our AFFO improved more than 240% to approximately $164 million, producing a 70% increase of AFFO per share on a fully diluted basis to $0.86. The strength of our AFFO is directly related to our investing $3.4 billion in 676 new real estate properties, and the closing and successful integration of the $2.3 billion acquisition of ARCT Trust III, the $2.2 billion acquisition of CapLease, and the $774 million acquisition of the GE Trust REIT**

*portfolio. . . . [W]e comfortably affirm our 2014 AFFO guidance of $1.13 to $1.19 per share . . . .*

Based on the strength of our acquisitions, success in our private capital management business, strategic execution of our balance sheet initiatives, and the continued savings in G&A costs, *we comfortably affirm our 2014 AFFO guidance of $1.13 to $1.19 per share.*

We currently have today 812.5 million shares and share equivalents outstanding on a fully diluted basis. *The end result of all these numbers I just mentioned is a run rate of around $1.11 to $1.13 per share AFFO.* Again, this number is a run rate through what we know today.

If we didn't do anything else as of April 1, we would achieve this roughly $1.12 per share for the prospective 12 months. We of course will continue to acquire more than the $1 billion we've discussed over the next nine months, and therefore achieve higher results.

These results demonstrate tremendous success and are a result of the equally tremendous hard work.

182.    Additionally, the following exchange regarding the transaction took place between analyst Chris Lucas of Capital One Securities and Defendant Block about the Company's full-year 2014 AFFO estimates:

**Analyst Lucas**: And then, again related to guidance, Brian, just in terms of getting to the low end of the numbers we should just assume that $1.13 at the low end is reflective of just essentially what you talked about before, which is what's done and nothing more?  Is that effectively how we should be thinking about the low end?

**Defendant Block**: That's correct.  To repeat Chris, if we didn't do anything past March 31, we would be at the low end of the range, notwithstanding the fact that we have a lot more acquisition potential for the duration of the year.

183.    Also during the call, Defendant Beeson commended American Realty's "acquisition machine" in the following exchange with analyst Josh Patinkin of BMO Capital Markets:

**Analyst Patinkin**: Okay. And is that, you think, what enabled you such an attractive initial yield, going into smaller deal size?

**Beeson**: Absolutely.  That is how we distinguish ourselves.  *No other company has the acquisition machine that we have built here*, that enables us to cost effectively do smaller one-off transactions, and that's how we're able to get the pricing differential.  We can buy three assets at a 7.75% or an 8% cap that another

competitor buys in a portfolio at a 6, 7% cap.  That's a significant spread differential, and we do that because we're able to, and we'll do granular level acquisitions.

184.   The statements referenced above in ¶¶169-83 were each materially false and misleading and omitted material facts when made.  The true facts were that:

(a)   American Realty's reported AFFO for the fourth quarter of 2013 was overstated by nearly 90%, and its reported AFFO for the full year of 2013 was overstated by 23%, as detailed above in ¶¶169, 172;

(b)   American Realty's financial statements were materially false and misleading as they did not accurately portray the Company's financial performance, and were not prepared in accordance with GAAP.  Specifically, American Realty reported that its AFFO for the year ending December 31, 2013, was $163,915,000.  Defendants have admitted, however, that the reported AFFO figure was materially inflated, including because American Realty improperly added back expenses associated with 100% of the equity interests in the Operating Partnership.  As a result, American Realty was forced to restate and amend its 2013 Form 10-K, including the following adjustments: (i) AFFO and AFFO per share were reduced by $43.9 million (23%) and $0.20 per share (23%), respectively; and (ii) net loss attributable to stockholders and net loss per share were increased by $16.8 million (3.5%) and $0.08 per share (3.5%), respectively;

(c)   American Realty's 2014 AFFO estimates were not accurate, attainable, honestly believed, or founded on a reasonable basis.  As Defendants knew but omitted to disclose to investors, American Realty's claimed AFFO growth could only be achieved through Defendants' continued falsification of American Realty's financial statements;

(d)   As the Company admitted in connection with its Restatement, American Realty's disclosure controls and procedures suffered from "material weaknesses" and were not properly designed or implemented to ensure that (i) AFFO per share was correctly calculated; (ii)

AFFO guidance, and the Company's ability to meet that guidance, were accurate; (iii) the information in its SEC filings correctly reflected its internal accounting records; and (iv) its SEC filings were reviewed on a timely basis by senior management and that significant changes in previously reviewed documents were brought to the attention of the Audit Committee for approval before filing;

(e)     As the Company admitted in connection with its Restatement, American Realty's internal controls over financial reporting suffered from "material weaknesses," which resulted in the Company failing to (i) maintain adequate controls to assess, authorize and monitor related-party transactions, validate the appropriateness of such transactions or manage the risks arising from contractual relationships with affiliates; (ii) maintain adequate controls over various grants of equity-based compensation; (iii) implement consistent policies and procedures relating to purchase accounting; (iv) establish clear reporting lines and job responsibilities or promote accountability over business process control activities; and (v) develop standardized policies and procedures for critical accounting estimates and non-routine transactions, including management review and approval of the accounting treatment of all critical and significant estimates;

(f)     The Company's rapid pace of mergers and acquisitions during the Relevant Period "had a severe impact on the Company's control environment" and exacerbated the deficiencies in American Realty's internal controls and financial reporting processes;

(g)     American Realty's "growth by acquisition" strategy was not beneficial for its shareholders, but instead, by design, generated transaction fees for Schorsch-controlled companies and resulted in large compensation payments to executives in Schorsch-controlled companies without regard to the underlying fairness of the transaction; and

85

(h)    Defendants' statement that the Company was "undervalued" was based on inflated AFFO numbers that were only possible through manipulation and falsification of American Realty's actual performance.

**11.    2013 Audit Opinion**

185.    The 2013 Form 10-K included the following unqualified audit opinion from Grant Thornton related to American Realty's 2013 financial statements and American Realty's system of internal controls over financial reporting:

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Board of Directors and Stockholders
American Realty Capital Properties, Inc.

We have audited the accompanying consolidated balance sheets of American Realty Capital Properties, Inc. (a Maryland corporation) and subsidiaries (the "Company") as of December 31, 2013 and 2012, and the related consolidated statements of operations and comprehensive loss, changes in equity, and cash flows for each of the three years in the period ended December 31, 2013. Our audits of the basic consolidated financial statements included the financial statement schedules listed in the index. These financial statements and financial statement schedules are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements and financial statement schedules based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of American Realty Capital Properties, Inc. and subsidiaries as of December 31, 2013 and 2012, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 2013 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the related financial

statement schedules, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

We also have audited, in accordance with the standards of the Public Company Accounting Oversight Board (United States), the Company's internal control over financial reporting as of December 31, 2013, based on criteria established in the 1992 *Internal Control-Integrated Framework* issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated February 27, 2014 expressed an unqualified opinion.

186.    The unqualified audit opinion was materially false and misleading because, as detailed herein:

(a)    American Realty's financial statements were materially false and misleading, violated GAAP, and did not accurately portray the Company's financial performance;

(b)    The related financial statement schedules did not present "fairly, in all material respects, the information set forth therein";

(c)    As the Company admitted in connection with its Restatement, American Realty's disclosure controls and procedures suffered from "material weaknesses" and were not properly designed or implemented to ensure that (i) AFFO per share was correctly calculated; (ii) AFFO guidance, and the Company's ability to meet that guidance, were accurate; (iii) the information in its SEC filings correctly reflected its internal accounting records; and (iv) its SEC filings were reviewed on a timely basis by senior management and that significant changes in previously reviewed documents were brought to the attention of the Audit Committee for approval before filing;

(d)    As the Company admitted in connection with its Restatement, American Realty's internal controls over financial reporting suffered from "material weaknesses," which resulted in the Company failing to (i) maintain adequate controls to assess, authorize and monitor related-party transactions, validate the appropriateness of such transactions or manage the risks arising

from contractual relationships with affiliates; (ii) maintain adequate controls over various grants of equity-based compensation; (iii) implement consistent policies and procedures relating to purchase accounting; (iv) establish clear reporting lines and job responsibilities or promote accountability over business process control activities; and (v) develop standardized policies and procedures for critical accounting estimates and non-routine transactions, including management review and approval of the accounting treatment of all critical and significant estimates; and

(e)    Grant Thornton's audit of the FY 2013 financial statements was not conducted in accordance with the standards of the Public Company Accounting Oversight Board ("PCAOB").

187.    Auditing standards have been established to ensure that external auditors fulfill their obligations when auditing and reviewing financial statements and other information contained in SEC filings. These standards include those originally established by the American Institute of Certified Public Accountants ("AICPA"), which include, *inter alia*, ten basic standards that establish the objectives of an audit and provide guidance for the quality of audit procedures, as well as interpretations of these standards. Additionally, as the result of the Sarbanes-Oxley Act of 2002, the PCAOB was created to oversee the audits of public companies. Subsequent to its creation, the PCAOB adopted, amended and expanded on the AICPA auditing standards and has also promulgated additional auditing standards.

188.    The PCAOB's Auditing Standards ("AS") No. 5, *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements*, identifies the following as indicators of material weakness(es) in a company's system of internal control:

- the identification of fraud, whether or not material, on the part of senior management; and
- a restatement of previously issued financial statements to reflect the correction of a material misstatement.

These indicators, which the Defendants have admitted were present during the Relevant Period, demonstrate that material weaknesses existed in American Realty's system of internal controls as of December 31, 2013.

189.    At a minimum, Grant Thornton violated the following auditing standards when examining American Realty's 2013 financial statements:

- Generally Accepted Auditing Standards ("GAAS") Standard of Reporting No. 1, which requires the audit report to state whether the financial statements are presented in accordance with GAAP;

- AS No. 8, *Audit Risk*, which provides that to form an appropriate basis for expressing an opinion on the financial statements, the auditor must plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement due to error or fraud; and

- AU §220, *Independence*, which requires that independence in mental attitude is to be maintained by the auditor in all matters related to the audit.

190.    In certifying American Realty's 2013 financial statements, Grant Thornton represented that its audit was performed in accordance with each of the above auditing standards, when it was not.  Accordingly, the representations in Grant Thornton's audit opinion were both objectively false and could not have been believed at the time they were rendered.

### 12.    First Quarter 2014 Financial Results

191.    On May 8, 2014, American Realty issued a press release announcing "Record First Quarter 2014 Operating Results" ("First Quarter 2014 Press Release").  That same day, the Company filed with the SEC a Form 8-K, which Defendant Schorsch signed, that included the press release as an exhibit.  The press release announced AFFO available to common stockholders of $147.4 million, or $0.26 per share, representing a year-over-year increase of 334.6%.  American Realty reaffirmed its full-year 2014 AFFO estimates of $1.13 to $1.19 per share.

192.    The First Quarter 2014 Press Release contained the following statements from Defendant Schorsch regarding the Company's financial results:

We had a record quarter with earnings *coming exactly in line with our expectations of $0.26 AFFO per share*, consistent with our previously stated guidance for the year.   Additionally, our year-to-date acquisitions, combined with properties currently under contract puts us well-ahead of schedule to achieve our total 2014 annual acquisition targets by midyear.  With our strengthened balance sheet, and the Company ready to capitalize on a number of large-scale sale- leaseback transactions, *we are in position to deliver strong shareholder return this year* . . .

193.    Likewise, Defendant Kay represented:

With our acquisitions team firing on all cylinders, *every aspect of our business is exceeding our expectations . . .  With strong earnings, our acquisition volume is outpacing our guidance*, our cap rates surpass all industry peers, Cole Capital launched two new products, and we successfully integrated our management and systems, all of which is allowing us to execute with a disciplined intensity.  The $1.7 billion of acquisitions we have closed or placed under contract were at a 7.92% cash cap rate or 8.26% GAAP cap rate.  These 150 self-originated transactions are indicative of *the scale and expertise of our platform, providing a significant competitive advantage.*

194.    Defendant Beeson further noted that the Company's *"improved operational and financial efficiencies"* had positioned American Realty *"well to drive meaningful growth."*

195.    The First Quarter 2014 Press Release also contained language similar to that included in other press releases during the Relevant Period with respect to the importance of AFFO.  *See, e.g.,* ¶115, above.

196.    Also on May 8, 2014, American Realty filed with the SEC its Form 10-Q for the quarter ended March 31, 2014 ("First Quarter 2014 Form 10-Q").  The First Quarter 2014 Form 10-Q was signed by Defendants Schorsch and Block, contained the same financial results and reported AFFO from the First Quarter 2014 Press Release, and represented that those financial results were accurate and presented in accordance with GAAP.   The First Quarter 2014 Form 10-Q also contained substantially similar statements about AFFO as compared to other documents filed by the Company with the SEC during the Relevant Period.  *See, e.g.,* ¶115, above.  Notably, although she signed the 2013 Form 10-K and the Second Quarter 2014 Form 10-Q, Defendant McAlister did not sign the First Quarter 2014 Form 10-Q.

197.    In addition, the Company provided the following table that quantified "the items deducted or added to net loss in our calculation of FFO and AFFO for the three months ended March 31, 2014 and 2013 (in thousands)" and assured investors that the amounts listed were "*presented net of any non-controlling interest effect where applicable*":

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2014 | 2013 |
| Net loss attributable to stockholders (in accordance with U.S. GAAP) | $ (332,313) | $ (141,163) |
| Gain on disposition of property | (2,979) | |
| Depreciation and amortization of real estate assets | 150,899 | 26,731 |
| Depreciation and amortization of real estate assets in unconsolidated joint ventures | 602 | — |
| FFO | (183,791) | (114,432) |
| | | |
| Acquisition related | 11,884 | 10,327 |
| Merger and other transaction related | 222,192 | 137,769 |
| Gain on investment securities | — | (451) |
| Loss on derivative instruments, net | 20,197 | 5 |
| Amortization of premiums and discounts on debt and investments | (18,325) | — |
| Dividends attributable to convertible preferred shares | 5,053 | — |
| Dividends attributable to participating securities | 936 | — |
| Amortization of above- and below-market lease assets and liabilities, net | 358 | 68 |
| Amortization of deferred financing costs | 37,940 | 1,243 |
| Other amortization and depreciation | 14,374 | 22 |
| Loss on early extinguishment of debt | 20,819 | — |
| Straight-line rent | (7,520) | (1,510) |
| Non-cash equity compensation expense | 22,510 | 881 |
| Proportionate share of adjustments for unconsolidated joint ventures | 762 | — |
| AFFO | $ 147,389 | $ 33,922 |

198.    Specifically, the table represented that AFFO was $147,389,000 for the three-month period ended March 31, 2014, compared to $33,922,000 for the three-month period ended March 31, 2013.

199.    Note 3 to the Third Quarter 2013 Form 10-Q, which was entitled "Summary of Significant Accounting Policies," represented that American Realty's financial statements "were prepared in conformity with U.S. GAAP" and that they included "all adjustments and accruals of a normal recurring nature, which, in the opinion of management, are necessary for a fair presentation of results for the interim periods."

200.    The First Quarter 2014 Form 10-Q also contained the same internal disclosure control Certifications and SOX Certifications that were included with American Realty's other Forms 10-Q filed during the Relevant Period.  *See, e.g.,* ¶119, above.  Again, Defendants Schorsch and Block signed the Certifications.

201.    Later on May 8, 2014, American Realty held a conference call to discuss the Company's first quarter 2014 financial results.  During the call, Defendant Schorsch stated: "Our first quarter earnings came in exactly where we expected, at $0.26 per share of AFFO," and reiterated that "[w]e are confident with our guidance for the full year of 2014 of $1.13 to $1.19 per share, and a forward quarterly run rate of $0.29 to $0.30 per share. . . ."  Likewise, Defendant Block noted that the first quarter 2014 AFFO was $0.26 per share, fully diluted, and that the Company's "current run rate based on AFFO per share fully diluted is between $0.29 and $0.30."  Following his prepared remarks, Defendant Schorsch stated that investors should buy American Realty stock as "we're way undervalued."  Defendant Schorsch further emphasized that "our stock is cheap."

202.    During the call, Defendant Beeson discussed aspects of the Company's operations and net lease portfolio, stated that it had "successfully integrated over 300 individuals from the multiple entities into one cohesive enterprise," and confirmed that the respective accounting systems had likewise been "fully integrated as well."

203.    The statements referenced above in ¶¶191-203 were each false and misleading and omitted material facts when made.  The true facts were that:

(a)    American Realty's reported first quarter 2014 AFFO of $147 million, or $0.26 per share, was overstated by 35%, as detailed above in ¶89;

(b)     American Realty had not achieved "record" results, was not experiencing "improved operational efficiencies," and was not positioned for meaningful growth, as the Company lacked reliable financial controls and, as a result, was issuing false financial reports, including materially inflated AFFO and unreliable AFFO guidance;

(c)     American Realty's financial statements referenced were materially false and misleading as they did not accurately portray the Company's financial performance, and were not prepared in conformity with GAAP.    Specifically, American Realty reported that its AFFO available to common stockholders was $147.4 million.    As confirmed by Defendants' admissions, however, that figure was inflated, including because American Realty improperly added back expenses associated with 100% of the equity interests in the Operating Partnership.    As a result, American Realty was forced to restate and amend the First Quarter 2014 Form 10-Q, including the following adjustments: (i) AFFO and AFFO per share were reduced by $38.5 million (26.1%) and $0.07 per share (26.9%), respectively; and (ii) net loss attributable to the Company and net loss per share were reduced by $17.2 million (5.58%) and $0.03 per share (5.58%), respectively;

(d)     American Realty's 2014 AFFO estimates and related statements about its projected earnings growth were not accurate, attainable, honestly believed, or founded on a reasonable basis.    To the contrary, American Realty's claimed AFFO growth could only be achieved through Defendants' continued falsification of American Realty's financial statements;

(e)     CAs the Company admitted in connection with its Restatement, American Realty's disclosure controls and procedures suffered from "material weaknesses" and were not properly designed or implemented to ensure that (i) AFFO per share was correctly calculated; (ii) AFFO guidance, and the Company's ability to meet that guidance, were accurate; (iii) the information in its SEC filings correctly reflected its internal accounting records; and (iv) its SEC

filings were reviewed on a timely basis by senior management and that significant changes in previously reviewed documents were brought to the attention of the Audit Committee for approval before filing;

(f)     As the Company admitted in connection with its Restatement, American Realty's internal controls over financial reporting suffered from "material weaknesses," which resulted in the Company failing to (i) maintain adequate controls to assess, authorize and monitor related-party transactions, validate the appropriateness of such transactions or manage the risks arising from contractual relationships with affiliates; (ii) maintain adequate controls over various grants of equity-based compensation; (iii) implement consistent policies and procedures relating to purchase accounting; (iv) establish clear reporting lines and job responsibilities or promote accountability over business process control activities; and (v) develop standardized policies and procedures for critical accounting estimates and non-routine transactions, including management review and approval of the accounting treatment of all critical and significant estimates;

(g)     The Company's rapid pace of mergers and acquisitions during the Relevant Period, including the Cole Merger, "had a severe impact on the Company's control environment" and exacerbated the deficiencies in American Realty's internal controls and financial reporting processes;

(h)     American Realty's "growth by acquisition" strategy was not beneficial for its shareholders, but instead, by design, to generated transaction fees for Schorsch-controlled companies and resulted in large compensation payments to executives in Schorsch-controlled companies without regard to the underlying fairness of the transaction;

(i)     Defendants' statement above in ¶203 that the Company had successfully integrated its financial systems and operations "into one cohesive enterprise" was false because

94

the Company lacked even the most basic accounting functions, including a standardized internal accounting close and cash reconciliation process; and

(j)     Defendants' statements above in ¶202 that the Company was generating "strong earnings" and was "way undervalued" were based on inflated AFFO numbers that were only possible through manipulation and falsification of American Realty's actual performance.

### 13.    May 21, 2014 Secondary Stock Offering

204.    On March 14, 2014, American Realty committed to offer up to 138 million of newly issued shares of common stock at $12.00 per share ("May 2014 Stock Offering"), which ultimately raised $1.65 billion.

205.    The May 2014 Stock Offering was conducted pursuant to the 2013 Shelf Registration Statement.  According to the 2013 Shelf Registration Statement, certain documents filed with the SEC were incorporated by reference:

> [A]ny reports filed by [American Realty] with the SEC after the date of this [statement] and before the date that the offering of securities by means of this prospectus is terminated will automatically update and, where applicable, supersede any information contained in this [statement] or incorporated by reference into this [statement].
>
> *        *        *
>
> All documents that [American Realty] file[s] (but not those that we furnish) pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended, or the Exchange Act, after the date of the initial registration statement of which this prospectus is a part and prior to the effectiveness of the registration statement . . . .
>
> *        *        *
>
> All documents that [American Realty] file[s] (but not those that we furnish) pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act on or after the date of this prospectus and prior to the termination of the offering of any of the securities covered under this prospectus . . . .

206.    The documents filed with the SEC that were incorporated by reference in the 2013 Shelf Registration Statement included American Realty's 2013 Form 10-K and First Quarter 2014

Form 10-Q, as well as a preliminary Prospectus Supplement filed May 21, 2014, a Prospectus Supplement filed May 23, 2014, and other offering materials identified herein.

207.    On May 21, 2014, American Realty issued the May 2014 Stock Offering Press Release, which announced the issuance of 100 million shares of newly issued American Realty stock.[6]  That same day, the Company filed with the SEC a Form 8-K, which Defendant Schorsch signed, that included the press release as an exhibit.

208.    The statements referenced above in ¶¶205-208 were each materially false and misleading and omitted material facts when made.  The true facts were that:

(a)    American Realty's financial statements referenced were materially false and misleading as they did not accurately portray the Company's financial performance, and were not prepared in accordance with GAAP.  Specifically, the AFFO that American Realty reported in its 2013 Form 10-K and its First Quarter 2014 Form 10-Q were inflated because American Realty improperly added back expenses associated with 100% of the equity interests in the Operating Partnership.  As a result, American Realty was forced to restate and amend its 2013 Form 10-K, including the following adjustments: (i) AFFO and AFFO per share were reduced by $43.9 million (23%) and $0.20 per share (23%), respectively; and (ii) net loss attributable to stockholders and net loss per share were increased by $16.8 million (3.5%) and $0.08 per share (3.5%), respectively. Additionally, American Realty restated and amended its First Quarter 2014 Form 10-Q, including the following adjustments: (i) AFFO and AFFO per share were reduced by $38.5 million (26.1%) and $0.07 per share (26.9%), respectively; and (ii) net loss attributable to the Company and net loss per share were reduced by $17.2 million (5.58%) and $0.03 per share (5.58%), respectively;

---

[6] Ultimately, 138 million shares of American Realty common stock were sold in the May 2014 Stock Offering, due to the underwriters' election to exercise their overallotment option.

(b)     American Realty's 2014 AFFO estimates were not accurate, attainable, honestly believed, or founded on a reasonable basis.  As Defendants knew but omitted to disclose to investors, American Realty's claimed AFFO growth could only be achieved through Defendants' continued falsification of American Realty's financial statements;

(c)     As the Company admitted in connection with its Restatement, American Realty's disclosure controls and procedures suffered from "material weaknesses" and were not properly designed or implemented to ensure that (i) AFFO per share was correctly calculated; (ii) AFFO guidance, and the Company's ability to meet that guidance, were accurate; (iii) the information in its SEC filings correctly reflected its internal accounting records; and (iv) its SEC filings were reviewed on a timely basis by senior management and that significant changes in previously reviewed documents were brought to the attention of the Audit Committee for approval before filing;

(d)     As the Company admitted in connection with its Restatement, American Realty's internal controls over financial reporting suffered from "material weaknesses," which resulted in the Company failing to (i) maintain adequate controls to assess, authorize and monitor related-party transactions, validate the appropriateness of such transactions or manage the risks arising from contractual relationships with affiliates; (ii) maintain adequate controls over various grants of equity-based compensation; (iii) implement consistent policies and procedures relating to purchase accounting; (iv) establish clear reporting lines and job responsibilities or promote accountability over business process control activities; and (v) develop standardized policies and procedures for critical accounting estimates and non-routine transactions, including management review and approval of the accounting treatment of all critical and significant estimates;

(e)     The Company's rapid pace of mergers and acquisitions during the Relevant Period "had a severe impact on the Company's control environment" and exacerbated the deficiencies in American Realty's internal controls and financial reporting processes;

(f)     American Realty's "growth by acquisition" strategy was not beneficial for its shareholders, but instead, by design, to generated transaction fees for Schorsch-controlled companies and resulted in large compensation payments to executives in Schorsch-controlled companies without regard to the underlying fairness of the transaction; and

(g)     The Company lacked appropriate controls to ensure, among other things, that its Code of Conduct was adhered to and that employees would not be subject to pressure to make inappropriate decisions concerning the formulation of American Realty's financial statements or calculation of AFFO.

## 14.    REITWeek Investor Forum

209.    On June 3, 2014, Schorsch spoke on behalf of the Company at the National Association of Real Estate Investment Trusts REITWeek Investor Forum in New York City. Schorsch emphasized to the institutional investors, securities analysts, and investment banking and financial service professionals in attendance the Company's increased acquisition guidance for 2014, stating that:

> We've also raised our acquisition guidance - our core acquisition guidance. This is critically important for people to understand about what we do. ***This is a very, very large enterprise. It's about $30 billion between our non-traded REITs that are*** the Cole brand and our traded American Realty balance sheet.
>
> *                   *                   *
>
> . . . But the reason we've raised our acquisition target is because we met the entire year's core acquisition target by June. It makes no sense to not have acquisitions in the last half of the year. Now granted, we do not expect anywhere near the acquisition speed in the last half of the year . . . but ***we did raise our target from $3 billion to $4.5 billion and we're currently already locked and loaded on $3.3 billion to close this year through the end of June.***

### 15.    June 20, 2014 Stockholder Memorandum

210.    On June 20, 2014, American Realty issued a stockholder memorandum ("June 2014 Stockholder Memorandum").  That same day, the Company filed with the SEC a Form 8-K, which Defendant Schorsch signed, that included the stockholder memorandum as an exhibit.   The memorandum contained statements by Schorsch and Kay regarding Schorsch's planned transition to Executive Chairman, and Kay's replacement of Schorsch as CEO in October 2014.   The stockholder memorandum also included a chart emphasizing that American Realty was "a compelling value proposition" because, among other things, it traded at the "lowest 2014 AFFO multiple" relative to its peers.

### 16.    Second Quarter 2014 Financial Results

211.    On July 29, 2014, American Realty issued a press release for the second quarter of 2014 ("Second Quarter 2014 Press Release").  That same day, the Company filed with the SEC a Form 8-K, which Defendant Schorsch signed, that included the press release as an exhibit.  The release announced AFFO of $205.3 million, representing a year-over-year increase of 429.0%, and AFFO per diluted share of $0.24, representing a year-over-year increase of 26%.  The Company also reported a net loss of $63.4 million, or $0.08 per share.  The Company also reported a "[p]ro forma normalized estimated AFFO run rate as of year-end 2014 of $1.18 to $1.20 per share including 2014 completed and announced transactions."

212.    The Second Quarter 2014 Press Release contained the following statement from Defendant Schorsch regarding the Company's financial results:

> *.  .  .  I have continued to focus my attention on improving corporate governance.  .  .  .  With the support of our Board of Directors, we are improving our practices by eliminating related party transactions, enhancing disclosures, evaluating executive compensation, opting out of the MUTA [Maryland Unsolicited Takeover Act] to assure our stockholders' right to elect the entire Board at each annual meeting, and implementing other policies designed to improve our reporting and transparency, further align interest with our*

*stockholders, and eliminate potential conflicts of interest. Our goal is to constantly improve our corporate governance, which we expect will ultimately be reflected in our corporate governance scores. All of these efforts are taken with a view toward creating long-term value for stockholders.*

213.    Likewise, Defendant Kay stated that American Realty was purportedly well-positioned to continue to provide value to its shareholders:

Our second quarter results and accomplishments are indicative of our focus on driving long-term value by delivering on our commitments. . . . In six months, we have fully integrated the organization, achieved $38.0 million of the $77.0 million of cost synergies to come in the first year, reduced leverage, de-risked the balance sheet, lengthened debt maturities, created $11.8 billion of unencumbered assets and significantly extended and upsized our credit facility. With these actions undertaken and the formative stage of the company behind us, we are focused on the day-to-day operations of the company. *Through all of these undertakings, we are positioned for long-term success.*

Our balance sheet acquisitions in the quarter, owned and under contract, of 1,217 properties in over 210 separate transactions demonstrates the continuing systematic execution of our core acquisition strategy and testifies to the repeatability of our investment process.

*        *        *

*The daily execution of these collective actions allows us to maintain our 2014 AFFO per share guidance of $1.13 - $1.19, while significantly de-levering the balance sheet and maximizing value for our stockholders.*

214.    The Second Quarter 2014 Press Release also contained language similar to that included in other press releases during the Relevant Period with respect to the importance of AFFO.  *See, e.g.,* ¶115, above.

215.    Also on July 29, 2014, American Realty filed with the SEC its Form 10-Q for the quarter ended June 30, 2014 ("Second Quarter 2014 Form 10-Q").  The Second Quarter 2014 Form 10-Q was signed by Defendants Schorsch, Block and McAlister, contained the same financial results and AFFO figures from the Second Quarter 2014 Press Release, and represented that those financial results were accurate and presented in accordance with GAAP.  The Second Quarter 2014

Form 10-Q also contained substantially similar statements about AFFO as compared to other documents filed by the Company with the SEC during the Relevant Period. *See, e.g.,* ¶115, above.

216.    In addition, the Company provided the following table that quantified "the items deducted or added to net loss in our calculation of FFO and AFFO for the three months ended June 30, 2014 and 2013 (in thousands)":

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
| | 2014 | 2013 | 2014 | 2013 |
|---|---|---|---|---|
| Net loss (in accordance with U.S. GAAP) | $ (43,265) | $ (72,433) | $ (363,920) | $ (214,028) |
| Dividends on Series F Preferred Stock | (17,773) | — | (35,416) | — |
| Adjusted net loss | (61,038) | (72,433) | (399,336) | (214,028) |
| Gain on disposition of property | (1,510) | — | (4,489) | (14) |
| Depreciation and amortization of real estate assets | 234,089 | 33,811 | 384,988 | 60,564 |
| Depreciation and amortization of real estate assets in unconsolidated entities | 3,120 | — | 3,722 | — |
| FFO | 174,661 | (38,622) | (15,115) | (153,478) |
| | | | | |
| Acquisition related | 8,453 | 37,119 | 20,337 | 47,446 |
| Merger and other transaction related | 13,286 | 6,393 | 235,478 | 144,162 |
| Gain on investment securities | — | — | — | (451) |
| (Gain) loss on derivative instruments, net | (21,926) | 31,174 | (1,729) | 31,179 |
| Amortization of premiums and discounts on debt and investments | (3,487) | — | (21,812) | — |
| Amortization of above- and below-market lease assets and liabilities, net | 2,133 | 68 | 2,491 | 136 |
| Net direct financing lease adjustments | 136 | — | 527 | — |
| Amortization and write off of deferred financing costs | 11,342 | 2,271 | 61,256 | 3,514 |
| Other amortization and depreciation | 24,750 | — | 39,124 | — |
| Loss on early extinguishment of debt | 3,985 | — | 24,804 | — |
| Straight-line rent | (17,413) | (3,059) | (24,933) | (4,568) |
| Non-cash equity compensation expense | 9,338 | 3,458 | 31,848 | 4,339 |
| Proportionate share of adjustments for unconsolidated joint ventures | 20 | — | 782 | — |
| AFFO | $ 205,278 | $ 38,802 | $ 353,058 | $ 72,279 |

217.    Specifically, the table represented that AFFO was $205,278,000 and $353,058,000 for the three and six month periods ended June 30, 2014, respectively, compared to $38,802,000 and $72,279,000 for the three and six month periods ended June 30, 2013, respectively. Notably, American Realty disclosed to investors for the first time that it was calculating AFFO on a gross rather than a net basis.

218.    Note 3 to the Second Quarter 2014 Form 10-Q, which was entitled "Summary of Significant Accounting Policies," represented that American Realty's financial statements "were prepared in conformity with U.S. GAAP" and that they included "all adjustments and accruals of a normal recurring nature, which, in the opinion of management, are necessary for a fair presentation of results for the interim periods."

219.    The Second Quarter 2014 Form 10-Q also contained the same internal disclosure controls Certifications and SOX Certifications that were included with American Realty's other Forms 10-Q filed during the Relevant Period.  *See, e.g.,* ¶119, above.  Again, Defendants Schorsch and Block signed the Certifications.

220.    Later on July 29, 2014, American Realty held a conference call to discuss the Company's second quarter 2014 financial results.  During the call, Defendant Kay stated:

> I could not be more excited about my senior management team and the future prospects of this Company.  ***From afar, it may appear at times our rapid growth is hard to understand.  I can assure you, however, that everything we do is directed towards a singular objective: to create value for our shareholders.***
>
> ***So why am I excited? I can tell you that it has a lot to do with our people, our culture, the opportunities we see in the marketplace, and our competitive advantages.***  Today we have roughly $30 billion of assets managed by more than 425 talented people located strategically throughout the country.  We have built this Company with the future in mind and we are well positioned to take advantage of market opportunities as they arise.
>
> <div align="center">*    *    *</div>
>
> For example, I am often asked, how can a company of our size consistently invest in properties at cap rates meaningfully better than our competitors.  There is no alchemy here, I assure you. In part, our ability to invest at prices better than our peer group's results from our origination team being the largest in the industry.
>
> <div align="center">*    *    *</div>
>
> I would like to talk about the equity offering we completed this quarter. I am pleased that we raised the money and deleveraged the balance sheet. With plenty of uncertainty in the global economy, heading into the summer reducing our leverage was the right choice, although not the most popular choice.
>
> <div align="center">*    *    *</div>

*American Realty is positioned for success. It is now not about creating this foundation, but building upon it. I could not be more excited about the prospects for this Company and I look forward to our future together.*

221.    Defendant Block commented on American Realty's second quarter 2014 financial

performance and AFFO guidance, stating, in relevant part:

Our second-quarter results are in line with our expectations. . . . ***AFFO was $198.6 million, or $0.24 per fully diluted share, which represents a 26% increase from this period last year. We are confident with our [AFFO] guidance range for the full year of 2014 of $1.13 to $1.19 per share. . . .***

*        *        *

Additionally, our internal operations continue[] to strengthen. The synergy created by the integration of the Cole team and the adoption of new technology has allowed us to be more timely and efficient in our financial reporting. In fact, this enhanced scale allowed us to move up the timing of our 10-Q filing and earnings call as a result of these improvements by roughly a week.

Let me turn to our earnings guidance numbers. . . . The second-half estimated AFFO projected run rate of $533 million . . . includes second quarter as well as G&A for the second half of the year of approximately $80 million, which is inclusive of commissions and cost synergies. This is consistent with our full-year estimate of total G&A, including noncash compensation of approximately $176 million. The run rate AFFO also includes an estimate for Cole Capital based on our projected $3.1 billion of capital raise and $4.9 billion of acquisitions into the managed funds. The projection results in AFFO for Cole Capital for the full year of approximately $120 million.

222.    On the call, the following exchange related to AFFO and AFFO guidance took place

between analyst Dan Donlan of Ladenburg Thalmann and Defendant Kay:

**Analyst Dolan**:  David, just wanted to go to the guidance of a quick just so I understand it. The pro forma AFFO run rate at year-end 2014, you have $1.18 to $1.20, that implies a quarterly run rate of $0.295 to $0.30. That's not a run rate for the fourth quarter, is it? Is that what it would be, call it, at the very end of the quarter for the first quarter assuming – for the first quarter of 2015 assuming nothing new to 2015. Is that right?

**Defendant Kay**:  That is correct. Other than for Cole Capital that would assume the same estimates for 2015 as we have estimated for 2014. So yes, that would be a year-end run rate but would assume the same $4.9 billion of assets acquired during 2015 as well as the same $3.1 billion of equity raised in the Cole Capital managed funds.

*    *    *

**Analyst Dolan**: If I am looking at the other guidance range that you reiterated, the one ***for the full-year 2014 of $1.13 to $1.19*** I think, ***the midpoint of that is $1.16***. So you have done $0.49 year to date. ***That would imply about $0.335 in the third quarter and fourth quarter to get to that midpoint – is that right as well?***

**Defendant Kay**:  That is roughly, yes, the math.  And the reason there being is again, most of the Cole Capital EBITDA will occur with the acquisitions in the capital (inaudible) in Cole Capital versus where we were the first two quarters of the year. It is a very steep ramp up, as you know.

**Analyst Dolan**: Yes, yes.  And so you probably have some benefit from [ARCenters] not getting full potentially until the first part of the fourth quarter as well.

**Defendant Kay**:  That is exactly right.  Because as articulated in that and part of the reason why we really wanted to lay that out is because you will have Red Lobster and ARCenters being owned for the three-month period, roughly, both at the same time. And that is why we tried to be transparent and give both numbers – give the AFFO run rate so that you will see the difference of actually Centers coming out as well as the year with both [AR]Centers and Lobster in at the same period of time.

*    *    *

Just to note, one other thing also in the estimates there is no promote or one-time disposition fees in any of the Cole numbers either in the AFFO run rate that we gave of $1.18 to $1.20 or in the $1.13 to $1.19 range where we reconciled to $1.14.

223.    The statements referenced above in ¶¶210-23 were each materially false and misleading and omitted material facts when made.  The true facts were that:

(a)    American Realty's reported AFFO of $0.24 per share was overstated by more than 14%, and its reported net loss of $40.3 million was understated by more than 26%;

(b)    American Realty's financial statements were materially false and misleading as they did not accurately portray the Company's financial performance, and were not prepared in accordance with GAAP.  Specifically, as to the second quarter of 2014, American Realty reported that AFFO was $205,278,000 and $353,058,000 for the three and six month periods ended June 30, 2014, respectively.  Defendants have since admitted, however, that these

figures are inflated because, among other things, American Realty improperly added back expenses associated with 100% of the equity interests in the Operating Partnership. This, in turn, caused American Realty's net loss to be understated for the three and six months ended June 30, 2014. Indeed, American Realty was forced to restate and amend the Second Quarter 2014 Form 10-Q, including the following adjustments: (i) AFFO and AFFO per share were reduced by $19.3 million (9.4%) and $0.03 per share (12.5%), respectively; and (ii) net loss attributable to the Company and net loss per share were increased by $14.4 million (35.7%) and $0.02 per share (35.7%), respectively;

(c)     American Realty's 2014 AFFO estimates were not accurate, attainable, honestly believed, or founded on a reasonable basis. As Defendants knew but omitted to disclose to investors, American Realty's claimed AFFO growth could only be achieved through Defendants' continued falsification of American Realty's financial statements;

(d)     As the Company admitted in connection with its Restatement, American Realty's disclosure controls and procedures suffered from "material weaknesses" and were not properly designed or implemented to ensure that (i) AFFO per share was correctly calculated; (ii) AFFO guidance, and the Company's ability to meet that guidance, were accurate; (iii) the information in its SEC filings correctly reflected its internal accounting records; and (iv) its SEC filings were reviewed on a timely basis by senior management and that significant changes in previously reviewed documents were brought to the attention of the Audit Committee for approval before filing;

(e)     As the Company admitted in connection with its Restatement, American Realty's internal controls over financial reporting suffered from "material weaknesses," which resulted in the Company failing to (i) maintain adequate controls to assess, authorize and monitor

related-party transactions, validate the appropriateness of such transactions or manage the risks arising from contractual relationships with affiliates; (ii) maintain adequate controls over various grants of equity-based compensation; (iii) implement consistent policies and procedures relating to purchase accounting; (iv) establish clear reporting lines and job responsibilities or promote accountability over business process control activities; and (v) develop standardized policies and procedures for critical accounting estimates and non-routine transactions, including management review and approval of the accounting treatment of all critical and significant estimates;

(f)    The Company lacked appropriate controls to ensure, among other things, that its Code of Conduct was adhered to and that employees would not be subject to pressure to make inappropriate decisions concerning the formulation of American Realty's financial statements or calculation of AFFO;

(g)    The Company was not improving its governance practices, reporting practices, transparency or practices concerning related party transactions.  During the same quarter that Defendants Schorsch, Kay and Block were making these representations, they had deliberately falsified American Realty's reported AFFO by tens of millions of dollars and its AFFO per share by more than 14%;

(h)    American Realty's operations did not "continue[] to strengthen" during the Relevant Period.  Rather, the Company's rapid pace of mergers and acquisitions during the Relevant Period, including the Cole Merger, "had a severe impact on the Company's control environment" and exacerbated the deficiencies in American Realty's internal controls and financial reporting processes;

(i)    American Realty's "growth by acquisition" strategy was not beneficial for American Realty shareholders, but instead, by design, generated transaction fees for Schorsch-

controlled companies and resulted in large compensation payments to executives in Schorsch-controlled companies without regard to the underlying fairness of the transaction;

(j)     The Company's financial reporting was neither "timely" nor "efficient," but instead was grossly inadequate, replete with inadequacies, and the product of fraudulent accounting artifices; and

(k)     American Realty's results for the second quarter of 2014 did not position the Company for "long-term success," and were not the product of Defendants' focus on driving long-term value for American Realty shareholders, but rather were the result of deliberate, pervasive, and systematic manipulation by Defendants Schorsch, Block, Kay and McAlister of American Realty's financial results, including its AFFO.

## VII.    AMERICAN REALTY VIOLATED GAAP AND SEC RULES

224.    As discussed above, throughout the Relevant Period, American Realty's periodic financial statements with the SEC represented that American Realty's financials were prepared in accordance with GAAP.  Financial statements filed with the SEC are presumed to be misleading and inaccurate if they have not been prepared in conformity with GAAP.  *See* Regulation S-X, 17 C.F.R. § 210.4-01(a)(1).  This presumption also exists for interim financial statements filed with the SEC.  *See* 17 C.F.R. § 210.10-01.

225.    American Realty has admitted that it failed to record approximately $10.5 million in "certain expenses," which caused the reported net loss attributable to the Company for the quarter ended June 30, 2014 to be understated by 18.6%.

226.    American Realty's financial statements during the Relevant Period violated GAAP (and certain of the Company's critical accounting policies) in numerous ways, including by failing to (i) record expenses in conformity with ASC Topic 450; (ii) disclose related party transactions in

conformity with ASC Topic 850; and (iii) timely record asset impairments in conformity with ASC Topic 360.

227.    The Company's Forms 10-K and 10-Q were also materially false and misleading because they failed to, as required by Item 303 of Regulation S-K, disclose known trends, demands, commitments, events, and uncertainties that were reasonably likely to have a material adverse effect on the Company's liquidity, net sales, revenues and income from continuing operations.

## VIII.    INAPPLICABILITY OF STATUTORY SAFE HARBOR

228.    The statutory safe harbor applicable to forward-looking statements under certain circumstances does not shield from liability any of the false or misleading statements pleaded in this Complaint.  The statements detailed herein were historical statements or statements of current facts and conditions at the time the statements were made.  Further, to the extent that any of the false or misleading statements alleged herein can be construed as forward-looking, the statements were not accompanied by any meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.

229.    Alternatively, to the extent the statutory safe harbor otherwise would apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because at the time each of those statements was made, the speakers knew the statement was false or misleading and/or the statement was authorized or approved by an executive officer of American Realty who knew that the statement was materially false or misleading when made.

## IX.    PLAINTIFFS' RELIANCE

230.    During the Relevant Period, Plaintiffs relied on the materially false and misleading statements alleged herein when purchasing American Realty Swaps.

231.    There is a presumption of reliance established by the fraud-on-the-market doctrine in this case because, among other things:

(a)    The Defendants made public misrepresentations or failed to disclose material facts during the Relevant Period;

(b)    The misrepresentations and omissions were material;

(c)    The Company's common stock traded in an efficient market;

(d)    The Swaps economically replicated physical trading of the Company's common stock and traded at the same market prices;

(e)    The misrepresentations and omissions alleged would induce a reasonable investor to misjudge the value of the Company's common stock; and

(f)    Plaintiffs purchased American Realty Swaps between the time Defendants misrepresented or failed to disclose material facts, and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

232.    At all relevant times, the market for American Realty common stock was efficient for the following reasons, among others: (a) American Realty common stock was listed, and actively traded, on the NASDAQ, a highly efficient and automated market; (b) American Realty filed periodic reports with the SEC; (c) American Realty regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services, and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and (d) American Realty was followed by numerous analysts who wrote reports that were published, distributed and entered the public market.  As a result of the foregoing, the market for American Realty stock (and, by extension, American Realty Swaps) promptly digested current

information with respect to the Company and reflected such information in the price of American Realty stock.  In purchasing American Realty Swaps, Plaintiffs relied on the price of American Realty stock, which reflected all the information in the market, including the misstatements by Defendants.

233.    Plaintiffs are also entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are also predicated upon omissions of material fact which there was a duty to disclose.

234.    In addition, Plaintiffs directly relied on Defendants' false and misleading statements alleged herein when deciding whether to purchase American Realty Swaps.  During the Relevant Period, Plaintiffs' investments were managed by their investment advisor, Clearline Capital, which employed an active strategy based on an analytical, research-based investment process.  Under this process, a portfolio manager, with the assistance of equity analysts, made the decisions whether to purchase, sell or hold Swaps for the Plaintiffs.  Analysts produced regular reports on individual companies, including American Realty, and were responsible for advising the portfolio manager about whether to purchase, sell, or hold shares in those companies.  Factors considered by the analysts and portfolio manager included, among other things, the financial performance of the Company and a review of the Company's strengths, weaknesses and opportunities.  The portfolio manager, in turn, relied on the analysts' reports as an important factor in deciding whether to purchase, sell, or hold shares.

235.    Throughout the Relevant Period, both the portfolio manager and the analysts undertook comprehensive asset valuation analyses and performed rigorous independent and fundamental research including reading and relying upon publicly available information concerning American Realty from the following sources: (a) American Realty's public statements,

plans and news releases; (b) American Realty's corporate website and materials posted on its website; (c) analyst reports and earnings conference calls involving American Realty; (d) American Realty's periodic securities filings with the SEC and the NASDAQ; (e) other regulatory filings and reports regarding American Realty; and (f) industry conferences and conference transcripts involving American Realty.

236.    In particular, the portfolio manager and the analysts read and relied on statements from the foregoing sources concerning American Realty's reported AFFO and net loss.  The portfolio manager and the analysts used the Company's reported AFFO and net loss as a metric to analyze American Realty's current and future operations and financial performance, and in making decisions whether to invest in American Realty or its competitors.  In so doing, the portfolio manager and analysts also read and relied on statements from these sources attesting to the effectiveness of the Company's internal financial and disclosure controls.

237.    On or about August 6, 2013, Plaintiffs, through their employees, read and reviewed the Second Quarter 2013 Form 10-Q and the Second Quarter 2013 Press Release, including specifically, the false and misleading statements identified above in ¶¶113-21.  On or about October 22, 2013, Plaintiffs read and reviewed the Cole Merger Announcement and Press Release, including specifically, the false and misleading statements identified above in ¶¶122-23.  Each of these documents was filed with the SEC pursuant to the Exchange Act.  In reliance upon the false and misleading statements in those documents, including reported AFFO and net loss, Plaintiffs purchased American Realty Swaps on at least three separate occasions from October 7, 2013 through November 6, 2013, and were damaged by the fraud detailed herein.

238.    On or about November 7, 2013, Plaintiffs, through their employees, read and reviewed the Third Quarter 2013 Form 10-Q and the Third Quarter 2013 Press Release, including

specifically, the false and misleading statements identified above in ¶¶129-37.  On or about December 3, 2013, Plaintiffs read and reviewed the ARCT IV Merger Proxy Materials, including specifically, the false and misleading statements identified above in ¶¶140-46.  On or about December 23, 2013, Plaintiffs read and reviewed the Cole Merger Proxy materials, including specifically, the false and misleading statements identified above in ¶¶150-60.  On or about February 7, 2014, Plaintiffs read and reviewed the February 7, 2014 Press Release, including specifically, the false and misleading statements identified above in ¶¶164-67.  Each of these documents was filed with the SEC pursuant to the Exchange Act.  In reliance upon the false and misleading statements in those documents, including reported AFFO and net loss, Plaintiffs purchased American Realty Swaps on at least three separate occasions from November 7, 2013 through February 26, 2014, and were damaged by the fraud detailed herein.

239.    On or about February 27, 2014, Plaintiffs, through their employees, read and reviewed the 2013 Form 10-K and the Fourth Quarter 2013 Press Release, including specifically, the false and misleading statements identified above in ¶¶169-83.  Each of these documents was filed with the SEC pursuant to the Exchange Act.  In reliance upon the false and misleading statements in those documents, including reported AFFO and net loss, Plaintiffs purchased American Realty Swaps on at least one occasion from February 27, 2014 through May 7, 2014, and were damaged by the fraud detailed herein.

240.    On or about May 8, 2014, Plaintiffs, through their employees, read and reviewed the First Quarter 2014 Form 10-Q and the First Quarter 2014 Press Release, including specifically, the false and misleading statements identified above in ¶¶191-200.  On or about May 8, 2014, Plaintiffs read and reviewed the Offering Materials for the May 2014 Stock Offering, including specifically, the false and misleading statements identified above in ¶¶201-02.  Each of these

documents was filed with the SEC pursuant to the Exchange Act. In reliance upon the false and misleading statements in those documents, including reported AFFO and net loss, Plaintiffs purchased American Realty Swaps on at least three separate occasions from May 8, 2014 through July 28, 2014, and were damaged by the fraud detailed herein.

241.    On or about July 29, 2014, Plaintiffs, through their employees, read and reviewed the Second Quarter 2014 Form 10-Q and the Second Quarter 2014 Press Release, including specifically, the false and misleading statements identified above in ¶¶211-19. Each of these documents was filed with the SEC pursuant to the Exchange Act. In reliance upon the false and misleading statements in those documents, including reported AFFO and net loss, Plaintiffs purchased American Realty Swaps on at least six separate occasions from July 29, 2014 through October 31, 2014, and were damaged by the fraud detailed herein.

242.    In addition, throughout the Relevant Period, certain of Plaintiffs' employees met directly with representatives at American Realty, including American Realty senior management and Board members. During these meetings, American Realty's representatives discussed a variety of issues related to the Company, including the Company's financial performance, actual and projected growth, mergers and acquisitions, corporate governance and internal financial controls. Information collected by Plaintiffs' employees during meetings with American Realty representatives informed the investment decisions of Plaintiffs' portfolio manager, and was a factor in the decisions to purchase, sell, or hold American Realty Swaps.

243.    Defendants' false and misleading statements alleged herein had a material influence and were a substantial factor in bringing about Plaintiffs' investment decisions with respect to American Realty stock. Plaintiffs did not know, and in the exercise of reasonable diligence could

not have known, of Defendants' false and misleading statements alleged herein when deciding if

they should purchase, sell, or hold American Realty Swaps during the Relevant Period.

## X.    LOSS CAUSATION

244.    During the Relevant Period, Defendants' wrongful conduct, as alleged herein,

directly and proximately caused the Plaintiff's economic loss.  As Defendants' false and misleading

statements and omissions became apparent to the market, beginning on October 29, 2014, the price

of American Realty stock (and Swaps) declined precipitously as the artificial inflation was

removed, causing substantial damage to Plaintiffs.

245.    As detailed above, before the market opened on October 29, 2014, American Realty

made a series of startling admissions regarding the effectiveness of its internal controls and the

accuracy of its financial information.  In direct response to these disclosures, American Realty

common stock plummeted, trading as low as $7.85 per share on October 29, 2014, on an extremely

heavy volume.  Before the market closed on October 29, 2014, American Realty held a conference

call for investors and analysts.  During the call, Defendant Kay provided further detail about the

fraud, but attempted to minimize its effects.  Specifically, Defendant Kay characterized it as "a

one-quarter adjustment," implied the fraud was known to, and committed by, just two Company

executives and stated that "[n]one of the executives that are currently at the Company have been

implicated during the investigation related to the concealment of that error."  Further, he reassured

investors that the Company's "controls and processes [had] continued to improve" in recent

months.  These assertions were later shown to be false by additional disclosures on October 30,

October 31, and November 3, 2014.  *See* ¶¶83-85, above.  On October 29, 2014, the price of

American Realty common stock closed at $10.00 per share – a decline of nearly 20% – on heavy

trading volume of over 231 million shares traded, which was nearly 30-times greater than the

average daily trading volume during the Relevant Period.

246.    On the next three consecutive trading days, the price of American Realty's stock price continued to decline by, respectively, 5.8%, 5.8% and 11.5%. By November 3, 2014, the Company's stock price closed at $7.85, a 36.6% drop from the pre-disclosure price. The Company's stock price continued to decline during this period as investors absorbed the information provided and learned additional facts about the Company's fraud and its impacts.

247.    The following chart demonstrates the clear divergence of the prices of American Realty stock from a relevant index, as the truth became known to the market:



248.    The declines in the price of American Realty stock (and American Realty Swaps) were the direct and proximate result of the nature and extent of Defendants' prior materially false and misleading statements and omissions being revealed to the market. The timing and magnitude of the price declines negate any inference that Plaintiffs' losses were caused by changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to Defendants' wrongful conduct.

XI.    **CLAIMS FOR RELIEF**

**COUNT I**
**VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT**
**AND SEC RULE 10b-5**

**(Against American Realty, ARC Properties, and the Executive Defendants)**

249.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

250.    This claim is brought by Plaintiffs against Defendants American Realty, ARC Properties, Schorsch, Block, Kay, Beeson and McAlister for violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

251.    As alleged above, during the Relevant Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or recklessly disregarded were misleading in that they misrepresented or omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

252.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs related to the purchase and/or acquisition of American Realty Swaps.

253.    Plaintiffs have suffered damages in that, in reliance on the integrity of the market, Plaintiffs paid artificially inflated prices for American Realty Swaps.  Plaintiffs would not have purchased or acquired American Realty Swaps at the prices they paid, or at all, if they had been

aware that those prices had been artificially inflated by Defendants' misleading statements and omissions.

254.    As a direct and proximate cause of Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases and acquisitions of American Realty Swaps during the Relevant Period.

## COUNT II
## VIOLATION OF SECTION 18(a) OF THE EXCHANGE ACT

### (Against American Realty And The Executive Defendants)

255.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

256.    This claim is brought by Plaintiffs against Defendants American Realty, Schorsch, Block, Kay, McAlister and Beeson for violation of Section 18(a) of the Exchange Act, 15 U.S.C. § 78r.

257.    As alleged above, Defendants filed or caused to be filed with the SEC documents regarding American Realty that contained misrepresented material facts and omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

258.    Plaintiffs read and relied upon the documents that Defendants filed or caused to be filed with the SEC prior to purchasing American Realty Swaps, including American Realty's periodic financial statements.  Plaintiffs' actual "eyeball" reliance on American Realty's SEC filings and financial statements specifically includes statements concerning the Company's AFFO and net loss.  In accordance with the Company's advice to investors, Plaintiffs relied upon AFFO as a useful and important metric to analyze American Realty's current and future operations and

financial performance, including in comparison to American Realty's competitors. Plaintiffs' reliance was reasonable.

259.    Plaintiffs read and relied upon these documents and financial statements not knowing they contained materially false statements and omissions. Had Plaintiffs known the true facts, they would not have purchased American Realty Swaps or would not have purchased them at the inflated price they paid.

260.    Defendants' materially false or misleading statements artificially inflated the prices of American Realty common stock and, in turn, American Realty Swaps.

261.    When the truth began to emerge about the false and misleading statements and omissions, the prices of American Realty common stock and American Stock Swaps declined significantly, and Plaintiffs were damaged.

262.    At the time of their purchases and acquisitions of American Realty Swaps, Plaintiffs were not aware of the untrue statements and/or omissions alleged herein and could not have reasonably discovered such untruths or omissions.

263.    As to this Count, Plaintiffs expressly disclaim any allegation of fraud or intentional misconduct except that any challenged statements of opinion or belief are alleged to have been materially misstated statements of opinion or belief when made. Such opinion statements also included embedded misstatements of material fact and omitted to state facts necessary to make the opinion statements not misleading.

## COUNT III
## VIOLATION OF SECTION 20(a) OF THE EXCHANGE ACT

### (Against American Realty, ARC Properties, AR Capital, RCS Capital and Certain Executive Defendants)

264.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

265.    Plaintiffs brings this claim against American Realty, ARC Properties, AR Capital, and RCS Capital for violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

266.    Plaintiffs also brings this claim against Schorsch, Block, Beeson, and Kay for violation of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

267.    The individuals and entities named in this Count acted as controlling persons of American Realty and ARC Properties within the meaning of Section 20(a) of the Exchange Act. By reason of their positions as officers or directors of, or their ownership interests in, American Realty and ARC Properties, the individuals and entities named herein had the power and authority to cause these entities to engage in the wrongful conduct alleged herein.

268.    American Realty is a subsidiary of AR Capital, which is a subsidiary of RCS Capital, the ultimate parent entity of Defendant Schorsch's empire.  As a result, RCS Capital controlled American Realty and ARC Properties during the Relevant Period.  American Realty and ARC Properties were also controlled by AR Capital.  Additionally, American Realty, which was ARC Properties' sole general partner and owned approximately 96.5% of its equity during the Relevant Period, controlled ARC Properties.  AR Capital and American Realty shared executive officers and Board members during the Relevant Period, including Defendant Schorsch and Mr. Kahane.

### COUNT IV
### NEW YORK COMMON LAW FRAUD

**(Against American Realty, ARC Properties And The Executive Defendants)**

269.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

270.    As alleged above, during the Relevant Period, Defendants American Realty, ARC Properties, Schorsch, Block, Kay, McAlister and Beeson misrepresented facts and omitted material

facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

271.    These misrepresentations and omissions constitute fraud and deceit under New York law.

272.    Plaintiffs reasonably relied upon the representations when making decisions to purchase American Realty Swaps and did not know of any of the misrepresentations or omissions at that time.

273.    As a direct and proximate result of the fraud and deceit by Defendants, Plaintiffs suffered damages in connection with their investment in American Realty Swaps.

274.    Defendants' wrongful conduct, as described above, was malicious, reckless and willful.  Accordingly, punitive damages, in addition to compensatory damages, are appropriate to deter fraudulent conduct of this kind.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.    Awarding Plaintiffs compensatory damages in an amount to be proven at trial for all injuries sustained as a result of Defendants' wrongdoing, including all interest thereon;

B.    Awarding Plaintiffs injunctive and other equitable relief, including rescission, as appropriate, in addition to any other relief that is just and proper under the circumstances;

C.    Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such other relief as this Court may deem just and proper.

## XIII.  <u>JURY TRIAL DEMAND</u>

Plaintiffs hereby demand a trial by jury in this action for all issues so triable.

Dated: October 27, 2015                     Respectfully submitted,

                                            BERNSTEIN LITOWITZ BERGER
                                              & GROSSMANN LLP

                                            _____

                                            BLAIR A. NICHOLAS
                                            JONATHAN D. USLANER
                                            DAVID KAPLAN
                                            12481 High Bluff Drive, Suite 300
                                            San Diego, CA 92130
                                            Tel:    (858) 793-0070
                                            Fax:    (858) 793-0323
                                            blairn@blbglaw.com
                                            jonathanu@blbglaw.com
                                            davidk@blbglaw.com

                                            MARK LEBOVITCH
                                            1285 Avenue of the Americas, 38th Floor
                                            New York, NY 10019
                                            Tel:    (212) 554-1400
                                            Fax:    (212) 554-1444
                                            markl@blbglaw.com

                                            *Counsel for Plaintiffs Clearline Capital
                                            Partners LP and Clearline Partners Master
                                            Fund, LP*